996 F.2d 1505
 COMMONWEALTH OF PENNSYLVANIA OFFICE OF The BUDGET, Appellee,
v.
DEPARTMENT OF HEALTH AND HUMAN SERVICES; Alma R. Jacobs,
Regional Director, Region III, Department of
Health and Human Services, Appellants.
 No. 92-7373.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 20, 1993.
Decided June 11, 1993.
 
 John M. Elliott, Henry F. Siedzikowski (argued), Timothy T. Myers, Margaret S. Curran, Elliott, Vanaskie & Riley, Blue Bell, PA, for appellee.
 Stuart M. Gerson, Asst. Atty. Gen., James J. West, U.S. Atty., Leonard Schaitman, Bruce G. Forrest (argued), Attys., Appellate Staff Civil Div., Dept. of Justice, Washington, DC, for appellants.
 Before BECKER, ALITO, and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 The Commonwealth of Pennsylvania Office of the Budget ("the Commonwealth") began this action to establish that it is not accountable for interest earned on federal grant funds that were placed in self-insurance accounts used to pay workers' compensation and health benefit claims by state employees who administer federally funded programs. The district court entered summary judgment for the Commonwealth, holding that the Commonwealth is entitled to keep such interest under Section 203(a) of the Intergovernmental Cooperation Act of 1968, 31 U.S.C. § 6503(a) (1988) (amended 1990) [hereinafter "Section 203(a)"]. We conclude that the district court's interpretation of Section 203(a) was incorrect, and we therefore reverse.
 
 I.
 
 2
 The federal government provides funding for a variety of welfare benefit programs that are administered by the states. Under these programs, the federal government furnishes money that the states then distribute to program recipients. In addition, the federal government reimburses the states for a portion of their administrative expenses. Among these administrative expenses are the costs of benefits, such as workers' compensation and medical benefits, for state employees who work on the programs.
 
 
 3
 Rather than purchasing insurance to cover workers' compensation and health benefit claims, the Commonwealth has chosen to be "self-insuring," that is, it has chosen to pay these costs out of special accounts created within its General Fund. The Commonwealth periodically transfers money into these accounts in order to maintain reserves that are sufficient, based on actuarial calculations, to cover expected future obligations. The Commonwealth assesses the federal government for a proportionate share of the money transferred into these accounts.
 
 
 4
 When the Director of the Division of Costs Allocation of the federal Department of Health and Human Services audited the Commonwealth's records for fiscal years 1986 through 1989, he discovered that the Commonwealth had failed to credit the federal government with its share of the interest that the Commonwealth had earned on the money in these accounts. He therefore concluded that this interest had to be refunded to the federal government.[1]
 
 
 5
 After an unsuccessful request for reconsideration by HHS's Regional Director for Region III, the Commonwealth appealed the determinations regarding fiscal years 1988 and 1989 to the HHS Departmental Appeals Board ("DAB"), contending that no interest had been earned on the federal portion of the self-insurance accounts and that, in any event, the Commonwealth was entitled to keep any such interest by virtue of Section 203(a) of the ICA. This provision stated:
 
 
 6
 Consistent with program purposes and regulations of the Secretary of the Treasury, the head of an executive agency carrying out a grant program shall schedule the transfer of grant money to minimize the time elapsing between transfer of the money from the Treasury and the disbursement by a State, whether disbursement occurs before or after the transfer. A State is not accountable for interest earned on grant money pending its disbursement for program purposes.
 
 
 7
 The DAB found that interest had in fact been earned, and it rejected the Commonwealth's Section 203(a) argument, concluding that "the self-insurance accounts were not grant funds held 'pending disbursement' within the meaning of Section 203." DAB Op. at 10, App. at 17. In enacting Section 203, the DAB wrote, "Congress was convinced that any interest earned on most grant funds between their transfer and their disbursement would be so minimal that it would not be worth the effort to account for the interest." Id. at 9, App. at 16. By contrast, the DAB observed, "[t]he self-insurance funds are, in essence, contingency funds to be tapped, or disbursed, only when claims are filed against them and paid by the State." Id. Noting that large amounts of interest had been earned on the federal contributions alone, the DAB found it "doubtful that Congress intended the ICA to be the vehicle for such a large amount of federally generated interest to be transferred to the State." Id. The DAB therefore upheld the determination that the Commonwealth was required to refund the interest earned on the federally contributed funds.
 
 
 8
 The Commonwealth then began this action in the United States District Court for the Middle District of Pennsylvania, seeking a declaratory judgment that it was not required to refund the interest, as well as an injunction prohibiting the Department of Health and Human Services and its Regional Director (hereinafter "HHS") from recapturing such interest. The district court subsequently granted summary judgment for the Commonwealth, holding that the Commonwealth was entitled under Section 203(a) to keep the interest. The district court refused to defer to HHS's interpretation of Section 203(a) on the ground that HHS is not responsible for enforcing that provision. Exercising plenary review, the court then opined that the language of Section 203(a) is unambiguous and is thus dispositive. The court concluded that funds held in the Commonwealth's self-insurance accounts were plainly held "pending disbursement for program purposes"--i.e., pending their use to pay employee claims--and that accordingly the Commonwealth was not accountable for interest earned on those funds.
 
 
 9
 Observing that "only the 'most extraordinary showing of contrary [legislative] intentions' " could justify disregarding the plain meaning of a statute, Dist.Ct.Op. at 15, App. at 77 (quoting Malloy v. Eichler, 860 F.2d 1179, 1183 (3d Cir.1988)), the court found the legislative history of Section 203(a) insufficient to meet that burden. The court wrote:
 
 
 10
 We recognize, and the legislative history reveals, that Congress designed the ICA to minimize the time between transfer and disbursement in order to eliminate the states' ability to profit from investing federal funds. However, while Congress may have had an expectation that a shorter time between transfer and disbursement would result in less interest being accumulated by the states, the idea that states should disburse funds promptly was not intended as a prerequisite to their right to retain interest. We agree that the House, Senate or committees voiced a concern to prevent states from obtaining windfalls, and section 203(a) was enacted to help alleviate this concern. However, the fact that Congress has not required "immediate disbursement" or placed a cap on the interest which may be earned, indicates that the statute may be applied to all situations involving the receipt of funds pending disbursements, although there may be occasions when states receive more than a de minimis amount of interest.
 
 
 11
 Id. at 16-17, App. at 78-79 (emphasis in original) (footnote omitted).
 
 
 12
 The court also found support for its decision in an HHS regulation (45 C.F.R. § 74.47(b)) and in recent legislative and administrative developments. The court noted that after the fiscal years in question in this case, Congress enacted an amendment of Section 203(a), 31 U.S.C. § 6503, that generally requires states, effective October 24, 1992, to pay interest to the United States on federal funds held in state accounts. The court further noted that in 1988 the Office of Management and Budget had proposed a revision of a prior notice (OMB A-87, 46 Fed.Reg. 9548 (1981)) that would have expressly prevented states from retaining interest on federal funds kept in self-insurance accounts. Apparently viewing these events as evidence that the states had previously been permitted to retain such interest, the court wrote that "[t]hese developments serve to bolster our decision that existing law does not preclude plaintiff from retaining the interest in question." Dist.Ct.Op. at 18, App. at 80. Finally, the court held that HHS had "abused [its] discretion by applying a new policy which render[ed] the plaintiff accountable for actions taken in good-faith reliance upon the ICA, OMB A-87, and the Department's own regulations." Id. at 19-20, App. at 81-82. The court therefore granted summary judgment in favor of the Commonwealth and remanded the case to HHS "for entry of a decision that pursuant to 31 U.S.C. § 6503(a) plaintiff is entitled to retain the interest at issue in this proceeding." Dist.Ct. Order, App. at 84.
 
 
 13
 HHS then took this appeal.
 
 II.
 
 14
 A. At the outset, the parties dispute whether the district court erred in refusing to defer under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to HHS's interpretation of Section 203(a). HHS argues that deference is appropriate because the President delegated to OMB the responsibility for prescribing rules and regulations implementing the ICA (Exec. Order 12,372, 47 Fed.Reg. 30,959 (1982)) and because OMB, in turn, designated HHS as the agency responsible for developing instructions for grantees. OMB A-87, Attachment A, J.3. The Commonwealth responds that this "chain of attenuated delegations" (Appellee Br. at 37) is insufficient to justify deference.
 
 
 15
 We do not find it necessary to resolve this dispute, particularly since the version of Section 203(a) at issue has now been amended. Even without deferring to HHS's interpretation, we are convinced that the district court's interpretation of Section 203(a) was incorrect.
 
 
 16
 B. The district court's decision rests primarily on the conclusion that the plain language of Section 203(a) unambiguously supports the Commonwealth's position. When statutory language is unambiguous, we must of course heed it except in those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). See also, e.g., Public Citizen v. United States Department of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989); Green v. Bock Laundry Machine Co., 490 U.S. 504, 509-10, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989). But, unlike the district court, we think that Section 203(a) is "not a provision in which Congress' limpid prose puts an end to all dispute." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 57, 108 S.Ct. 376, 380, 98 L.Ed.2d 306 (1987). Indeed, the district court and the Commonwealth--both of whom fervently maintain that Section 203(a) is unambiguous and both of whom conclude that the Commonwealth is entitled to keep the interest--have provided a striking demonstration of the ambiguity of Section 203(a) by proffering two entirely different but nevertheless plausible interpretations of the pertinent statutory language.
 
 
 17
 The district court had no doubt that the key statutory phrase--"pending ... disbursement [of federal grant money] for program purposes"--referred to the time period during which federal monies were kept in the self-insurance funds prior to disbursement to claimants. This interpretation of the statutory language, however, is not without problems, for if it were correct, it would seem questionable whether Section 203(a) would permit federal agencies to make contributions to self-insurance funds at all. As noted, the first sentence of Section 203(a) says that federal departments and agencies must schedule the transfer of funds "so as to minimize the time elapsing between the transfer of the money from the Treasury and the disbursement by a State." However, the very nature of self-insurance funds--in which monies remain on deposit for lengthy periods--seems inconsistent with such minimization.
 
 
 18
 Perhaps in recognition of this problem, the Commonwealth asserts that the statutory language unambiguously supports a completely different interpretation. According to the Commonwealth, disbursement occurs when the federal money is initially placed in the reserve accounts, not when claims are paid from those accounts.
 
 
 19
 In the face of these conflicting interpretations, we could hold that the statutory language is unambiguous only by concluding that either the district court's or the Commonwealth's interpretation is unreasonable. Cf. New Castle County v. Hartford Accident & Indemnity Co., 933 F.2d 1162, 1198 (3d Cir.1991) (contract term is ambiguous when capable of two reasonable interpretations); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980) (same). This we cannot do. Looking only at the statutory language, we believe that both interpretations are reasonable, and thus it is apparent that the statutory language is ambiguous. Consequently, it is appropriate to look beyond the statutory language and consider the background, purpose, and legislative history of Section 203(a). Green, 490 U.S. at 511, 109 S.Ct. at 1985; Dixson v. United States, 465 U.S. 482, 491, 104 S.Ct. 1172, 1177, 79 L.Ed.2d 458 (1984).
 
 
 20
 C. Before Section 203 was enacted in 1968, it had long been established in decisions of the Comptroller General that interest earned by a grantee on funds advanced by the United States belonged to the United States rather than the grantee and had to be refunded unless special authorization was provided. See, e.g., 42 Comp.Gen. 1289 (1962); 1 Comp.Gen. 652 (1922); see also 64 Comp.Gen. 96 (1984); 59 Comp.Gen. 218 (1980). By 1968, however, an " 'extraordinary expansion in the dollar amounts and number of grants-in-aid' " had produced " 'serious management difficulties.' " H.R.Rep. No. 1845, 90th Cong., 2d Sess. 9 (1968), reprinted in 1968 U.S.C.C.A.N. 4220, 4229 (quoting Advisory Commission) [hereinafter "House Report"]. The ICA was intended to correct some of these problems and alleviate the administrative burdens on the states.
 
 
 21
 One of these burdens was the need to account for interest earned on federal funds, and Section 203(a) was meant to eliminate this burden while at the same time preventing the states from obtaining a windfall by holding federal funds for lengthy periods and earning substantial amounts of interest prior to disbursement. The Senate Report stated that Section 203 would "minimize the time between the Treasury transfer and the disbursement by the State." S.Rep. No. 1456, 90th Cong., 2d Sess. 15 (1968). "It is further intended," the Senate Report continued, "that States will not draw grant funds in advance of program needs." Id. The Report explained that "new techniques, such as the letter of credit and sight draft procedures now used by Treasury, should minimize the amount of grants advanced, and thus it should not be necessary to continue to hold States accountable for interest or other income earned prior to disbursement." Id.
 
 
 22
 In a similar vein, the House Report stated that "Federal funds will be retained by the U.S. Treasury until actually needed by the State for the payment of obligations incurred under the particular grant program." House Report at 5, 1968 U.S.C.C.A.N. at 4225. On the floor of the House, Representative Fascell explained (114 Cong.Rec. 26,986 (1968)):
 
 
 23
 Section 203 establishes a procedure designed to discourage the advancement of Federal grant-in-aid funds for longer time periods than are necessary.... Effective Government-wide implementation of this mechanism should save the Federal Government considerable amounts of interest costs.
 
 
 24
 See also 114 Cong.Rec. 26,979 (1968) (statement of Rep. Erlenborn) ("To prevent States from gaining an unfair advantage through earning interest on federal funds so deposited, such funds shall be transferred to States so as to minimize the timelapse between transfer and disbursement.").
 
 
 25
 The Comptroller General (House Report at 29, 1968 U.S.C.C.A.N. at 4247) and the Department of Health, Education, and Welfare (House Report at 18, 1968 U.S.C.C.A.N. at 4238) objected to the provision relieving the states from accountability for interest. The Secretary of HEW stated that this provision "might be an incentive to States to draw the funds sooner than actually needed, contrary to the objective of Section 203." House Report at 29, 1968 U.S.C.C.A.N. at 4247. The House initially deleted this provision from the bill, but the Senate retained it, and the provision was accepted by the Conference Committee (H.R.Conf.Rep. No. 1934, 90th Cong., 2d Sess. 12, reprinted in 1968 U.S.C.C.A.N. 4248, 4249) and enacted, presumably based on the House's belief that the scheduling of transfers would mean that "the amount of such interest in the future should be rather small." House Report at 9, 1968 U.S.C.C.A.N. at 4229.
 
 
 26
 D. In light of this background, we are convinced that the statutory phrase "pending its disbursement for program purposes" was intended to have a specific and limited meaning. This phrase was intended to refer to the period during which a state temporarily holds federal grant-in-aid money that is destined for prompt transfer to the ultimate recipients of program benefits. The phrase was clearly not intended to refer to the long-term holding of federal funds in reserve accounts. On the contrary, it seems clear that the congressional committees and the supporters of Section 203(a) would have been shocked by the thought that a state could keep millions of dollars of interest on federal funds placed in such accounts. Congress thought that Section 203(a) would prevent states from holding federal funds for any appreciable period of time. It intended to "save the Federal Government considerable amounts of interest costs" (114 Cong.Rec. 26,986), not to give the states a huge interest windfall.
 
 
 27
 As we have noted, before Section 203(a) was enacted, it was a well-established rule that recipients of federal grants were required to return any interest earned on such grants prior to their use unless they were specifically authorized to keep it. When Congress enacted Section 203(a), it wanted to modify this rule regarding interest on federal grants, but it most assuredly did not intend to sanction what the Commonwealth tried to do in this case. Statutes that modify settled rules should " 'be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.' " United States v. Texas, --- U.S. ----, ----, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (holding that statute did not abrogate the long-established rule that states must pay prejudgment interest on debts to the federal government) (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). Thus, we are reluctant in this case to interpret Section 203(a) as abrogating the prior, established rule to a far greater extent than Congress intended.
 
 
 28
 In sum, we are convinced that the statutory phrase "pending ... disbursement for program purposes" was not intended to refer to the long period of time during which federal funds are kept in self-insurance accounts such as those maintained by the Commonwealth. Entitlement to interest earned on those accounts, therefore, is governed by the rule, which predates the enactment of Section 203(a), that holders of federal grant money are required, absent specific authorization, to refund any interest earned on that money to the federal government.
 
 III.
 
 29
 The remaining arguments advanced by the Commonwealth and the district court do not require lengthy discussion. Both the Commonwealth and the district court suggest that a regulation promulgated by HHS to implement Section 203(a) (45 C.F.R. 74.47(b)) supports the Commonwealth's entitlement to the interest in dispute. We disagree. Whether or not HHS's interpretation of Section 203(a) itself is entitled to deference, we must certainly defer to HHS's interpretation of its own regulations. See Immigration and Naturalization Service v. National Center for Immigrants' Rights, Inc., --- U.S. ----, ----, 112 S.Ct. 551, 555-56, 116 L.Ed.2d 546 (1991); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Moreover, it is quite clear that this regulation was simply intended to incorporate the rule contained in Section 203(a) and was not intended to give the states an even greater exemption from accountability for interest earned on federal grant funds.[2]
 
 
 30
 We likewise see no merit in the Commonwealth's argument that "the legislative history of the [1990 amendment of Section 203] provides indisputable evidence that under current law, states are not accountable for interest earned on federal funds pending disbursement for program purposes until commencing October 24, 1992." Appellee Br. at 24. In the first place, "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress." Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). Moreover, the only provision of the legislative history of the 1990 enactment cited by the Commonwealth merely restates the general rule regarding accountability for interest contained in Section 203(a). This portion of the legislative history says nothing whatsoever concerning accountability for interest earned on self-insurance accounts or any other accounts similar to those at issue here.[3]
 
 
 31
 For similar reasons, we see no significance for present purposes in OMB's 1988 proposal to modify OMB A-87 to prevent states from retaining interest earned on self-insurance accounts. We see no indication that this proposal was anything more than an effort to obviate future difficulties. We certainly see no indication that it represented a concession by the federal government that states were entitled to retain such interest under the existing law.[4]
 
 
 32
 We also reject the Commonwealth's argument that HHS, by seeking to recover interest earned on self-insurance accounts, in effect amended OMB A-87 in violation of the Administrative Procedure Act's rulemaking procedures. HHS simply sought to enforce by adjudication the Commonwealth's obligation to return interest owed the federal government in accordance with a long-established rule. The rulemaking provisions of the APA are therefore totally inapplicable.
 
 
 33
 Finally, we do not reach the Commonwealth's argument that in fact no interest was earned on the self-insurance accounts in question. As previously noted, the DAB explored and rejected this argument. The district court, however, did not explicitly address this point. Consequently, we do not address this question in the present appeal. If the Commonwealth chooses to press this contention on remand, the district court will be free to address it.
 
 
 34
 The district court's order will be reversed, and the case will be remanded for further proceedings consistent with this opinion.
 
 
 35
 BECKER, Circuit Judge, dissenting.
 
 
 36
 Section 203(a) of the Intergovernmental Cooperation Act of 1963, 31 U.S.C. § 6503(a) (1988) [hereinafter "ICA"], accords the Commonwealth of Pennsylvania ("Commonwealth") the right to retain "interest earned on grant money pending its disbursement for program purposes." Id. In my view, the import of this language is clear, and neither the majority nor the Department of Health and Human Services ("HHS") has offered a compelling argument that the federal funds in question do not meet the "pending disbursement" or "program purposes" requirements of the ICA. Because I believe the statute's interest repayment exemption applies to the facts of this case, I would hold that the Commonwealth is entitled to retain the interest earned on the federal grant money used in its self-insurance reserves.[1]
 
 I.
 
 37
 Stated in full, § 203(a) of the ICA provides:
 
 
 38
 Consistent with program purposes and regulations of the Secretary of the Treasury, the head of an executive agency carrying out a grant program shall schedule the transfer of grant money to minimize the time elapsing between transfer of the money from the Treasury and the disbursement by a State, whether disbursement occurs before or after the transfer. A State is not accountable for interest earned on grant money pending its disbursement for program purposes.
 
 
 39
 31 U.S.C. § 6503(a) (1988) (amended in 1990) (emphasis added). In the instant case, there was, admittedly, a particularly long time between the point at which the Commonwealth "drew down" the money from the federal government to place in its self-insurance reserves and the point at which the Commonwealth disbursed the money to cover insurance claims. That, however, does not change the fact that the federal funds, while they were within the Commonwealth's self-insurance reserve accounts prior to their use to satisfy insurance claims, were "pending ... disbursement for program purposes." I agree with the district court that the disbursement of the money occurred when the Commonwealth applied it for its ultimate purpose, the reimbursement of insurance claims. The period before this act occurred was therefore "pending ... disbursement."
 
 
 40
 The majority acknowledges that this interpretation of § 203(a) is plausible, but concludes that this provision is ambiguous because the Commonwealth has asserted an alternative interpretation which the Majority deems equally plausible. See Majority at 1510. Specifically, the Commonwealth submits that under § 203(a) the federal funds were disbursed at the point at which the Commonwealth received them from the federal government, not (as the district court concluded) at the time when the Commonwealth used the federal funds to satisfy insurance claims. According to the Commonwealth, therefore, once the relevant funds were deposited within its self-insurance reserve accounts, the federal government lost all claims on the funds, as they were then entirely the property of the Commonwealth. Based on this logic, the Commonwealth then claims entitlement to any interest earned, as it was interest earned on its own money.
 
 
 41
 Accepting the majority's contention that both the Commonwealth's and the district court's views are plausible--though as just discussed I adhere to the view of the district court--the conclusion the majority reaches is counterintuitive. While crediting the interpretations of the Commonwealth and the district court, both of which result in the conclusion that the Commonwealth is entitled to retain the interest, the majority nonetheless determines that the federal government retains the interest. The majority reaches this surprising result because, having identified a conflict between the interpretations of the district court and the Commonwealth over an arguably ambiguous clause within § 203(a), it then turns to the legislative history, not so much to aid its interpretation of the clause in question, but to supplant the terms of § 203(a) in its entirety, including language that is clear and unambiguous.
 
 
 42
 Even if the ambiguous meaning of "pending ... disbursement" may justify the majority's decision to look to the legislative history to interpret that phrase (despite the fact that both approaches giving rise to the ambiguity lead to the same result in favor of the Commonwealth), it does not license the majority to use the legislative history to reconstrue the statute as a whole. Even though there may be two equally plausible interpretations of "pending ... disbursement" as applied to this case, the majority ignores what the statute does make clear: a state does not have to refund the interest on federal funds under either the district court's or the Commonwealth's interpretations.
 
 
 43
 Moreover, in my view, the Commonwealth has easily met the second requirement of § 203(a), that the federal funds be used for "program purposes." It is undisputed that HHS has approved Pennsylvania's use of federal money for self-insurance reserves,[2] a practice which saved money for both the Commonwealth and the federal government. Although HHS has correctly pointed out that the interest on the federal funds, when it was diverted into the Commonwealth's general revenue accounts, was not put to use for program purposes, this fact is irrelevant under § 203(a). Section 203(a) requires that the federal grant money, not the interest it generates, must be used toward the goals of the federal-state cooperative program.[3]
 
 II.
 
 44
 In order to avoid the application of the plain language of § 203(a), the majority, as I have noted, resorts to the legislative history of the ICA, which it then uses to effectively re-write the statute. It is well-established that, ordinarily, legislative history does "not trump the facial meaning of [a] statute," because if "the language of the statute is clear, only the most extraordinary showing of contrary intentions justif[ies] altering the plain meaning of a statute." American Lung Ass'n of N.J. v. Kean, 871 F.2d 319, 325 (3d Cir.1989) (citations and internal quotations omitted); accord Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984), TVA v. Hill, 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978); Malloy v. Eichler, 860 F.2d 1179, 1183 (3d Cir.1988). I do not believe that the majority has made the "extraordinary showing" of contrary legislative intent necessary to warrant its disregard of § 203(a)'s explicit language.
 
 
 45
 The majority correctly points out, see Majority Typescript at 8, that the general, background purpose of the ICA as a whole was to "improve the administration of grants-in-aid to the States" in order to alleviate the management problems created by the vast increase in number and size of federal grants to the states. H.R.Conf.Rep. No. 1934, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968 U.S.C.C.A.N. 4248. In addition, as the majority explains, § 203(a)'s drafters believed that the period of time between a state's receipt of federal funds and its disbursal of those funds should be minimized. See Majority at 1510 (citing S.Rep. No. 1456, 90th Cong., 2d Sess. 15 (1968)). Apparently based on the assumption that there would be a short lag time between a state's draw-down of the funds and their disbursal, the drafters of § 203(a) exempted the states from the burden of accounting for and repaying the federal government for interest earned on federal funds, thereby relieving them of a previous administrative and fiscal burden. See S.Rep. No. 1456, 90th Cong., 2d Sess. 15 (1968). Although allowing the Commonwealth to retain the interest in this case may call into question the wisdom of the drafters' apparent assumption that there would be a minimal period between federal and state disbursal, that assumption, by itself, cannot override the explicit provisions the drafters included in the ICA itself.
 
 
 46
 Indeed, it seems clear to me that despite this assumption, the drafters of § 203(a) were willing to place the burden of minimizing the pre-disbursal time period on the relevant federal agency, not on the states. Congress, in enacting § 203(a), changed the pre-existing rule that state-grantees were accountable for the interest on federal funds. See 42 Comp.Gen. 289 (1962). The drafters of § 203(a) could have either retained the pre-existing rule or at least retained it in those situations in which states would receive federal funds for a considerable period before their disbursement. However, Congress chose not to do so.
 
 
 47
 The legislative history makes clear that Congress' decision to free the states from the burden of accounting for interest earned on federal grants was not inadvertent, but deliberate and well-considered. Both the Comptroller General, see H.R.Rep. No. 1845, 90th Cong., 2d Sess. 29 (1968), reprinted in 1968 U.S.C.C.A.N. at 4247, and the Secretary of the Department of Housing, Education and Welfare, see id. at 18; 1968 U.S.C.C.A.N. 4238, informed Congress of their objections to § 203(a)'s elimination of the states' duty to account for interest on federal grants. The House of Representatives deleted the provision, while the Senate retained it. At the joint House-Senate conference, the current version of § 203(a) was adopted, exempting states from accountability for interest. The legislative history reveals, therefore, that Congress quite deliberately relieved the states from their liability for interest, while imposing on federal agencies the duty of minimizing the time during which the states would retain federal money before using it.[4]
 
 III.
 
 48
 Rather than follow Congress' decision to relieve the states from refunding the interest on undisbursed federal funds, the majority relies on the rule which existed prior to the enactment of the ICA, that all federal grantees must refund any interest earned on federal grants prior to their disbursal, absent specific authorization to the contrary. To do so, the majority invokes the "presumption favoring the retention of long-established and familiar principles." United States v. Texas --- U.S. ----, ----, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (citing Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). Yet this presumption in favor of the retention of a pre-existing common law rule does not apply when Congress has legislated on the issue, " 'speak[ing] directly' to the question addressed by the common law." Id. In the situation at hand, Congress was aware of the old rule that grantees were responsible for the interest on federal money and, through § 203(a), specifically acted to eliminate that rule. Simply put, Congress has directly spoken to the common law rule, having abrogated it with respect to state grantees. For this reason, adherence to the pre-existing common law rule rather than the statutory rule which replaced it is, in my view, improper.
 
 IV.
 
 49
 In sum, I would follow the language of § 203(a) of the ICA, which I consider clear. I do not believe the legislative history so clearly evinces a contrary intention as to justify a failure to follow the statute's plain language. At best, the legislative history reveals an assumption by the drafters as to the length of time during which states would retain federal funds. The fact that this assumption has not always proven correct, however, cannot overcome the plain language of § 203(a). Applying § 203(a)'s terms to the facts at hand, I would hold that the federal funds were pending disbursement after being deposited in the Commonwealth's self-insurance reserves and prior to being used to satisfy insurance claims. In addition, the Commonwealth, by using the federal funds to supplement its self-insurance reserves, was using the federal money for a program purpose. I therefore would hold that the Commonwealth is entitled to retain the interest earned on the federal funds, hence I respectfully dissent.
 
 
 
 [1]
 HHS contends that the interest on the federal monies for fiscal years 1986 through 1989 totals more than $7.5 million
 
 
 [2]
 45 C.F.R. § 74.47(b) provides in pertinent part (emphasis added):
 In accordance with the Intergovernmental Cooperation Act of 1968 (Pub.L. 90-577), States ... shall not be accountable to the Federal Government for interest or investment income ... where this income is attributable to grants-in-aid....
 Thus, the language of this subsection alone makes it clear that HHS merely intended to incorporate the rule contained in the ICA. Moreover, subsection (a) of the same provision states that "[e]xcept when exempted by federal statute (see paragraph (b) of this section for the principal exemption), grantees shall remit to the Federal Government any interest or other investment income earned on advances of HHS grant funds." 45 C.F.R. § 74.47(a).
 
 
 [3]
 The Commonwealth relies on the following statement in the 1990 House Report:
 Under the current law, the States need not account to the Federal Government for interest earned on Federal funds disbursed to the States prior to payment to program beneficiaries.
 H.R.Rep. No. 696, 101st Cong., 2d Sess. 3 (1990), reprinted in 1990 U.S.C.C.A.N. 1691, 1691-1692.
 
 
 [4]
 The Commonwealth's reliance on three other actions taken by OMB is likewise misplaced. First, the fact that OMB has allowed the states to place federal money in self-insurance reserves (OMB A-87, Attachment B, C.4.c.) does not show that OMB meant to allow states to keep the interest earned on federal funds placed in such accounts. Second, the fact that another section of the same OMB notice does not specifically list interest earned on such accounts as an item that must be reimbursed is not significant. The list contained in this provision is, by its terms, not exhaustive. See id., Attachment A, C.1.g. Third, we see no significance for present purposes in a memorandum issued by an OMB officer to federal agencies in 1986 urging them to refrain from "all independent interest initiatives" pending enactment of the 1990 legislation. Contrary to the Commonwealth's contention, we cannot read this memorandum as an "affirmation by the Executive Branch" that states are not accountable for interest earned on self-insurance funds
 
 
 [1]
 Like the majority, I do not reach the interesting question raised by the parties--whether we owe deference, under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to HHS's interpretation of the ICA when Congress did not delegate the authority to implement this statute directly to HHS, but rather to the Treasury Department. Through an executive order, see Exec.Order No. 12,372, 47 Fed.Reg. 30,959 (1982), the President has delegated the authority to implement and administer the ICA to the Office of Management and Budget ("OMB"), which, in turn, has delegated authority to HHS for "developing and issuing the instructions for use by grantees in preparation of cost allocation plans," OMB A-87, Fed.Reg. 9548, 9551 (Jan. 28, 1981) [hereinafter "OMB A-87"]. I need not address this Chevron question because, in my view, the language of the ICA is clear and on-point, and it is well-established that courts must follow the language of the statute itself rather than a contrary agency interpretation when the statute speaks directly and unambiguously on an issue. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82; see also Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 453-54, 107 S.Ct. 1207, 1224-25, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring)
 
 
 [2]
 OMB A-87 also contemplates the use of federal funds for self-insurance reserves. See 46 Fed.Reg. at 9554 ("Contributions to a reserve for a self-insurance program approved by the Federal grantor agency are allowable.")
 
 
 [3]
 In addition, as the Commonwealth points out, HHS did not raise the argument that the federal funds did not comply with the program purposes requirement of § 203(a) before the district court. It is therefore waived
 
 
 [4]
 I reach my conclusion as to the meaning of § 203(a) without resort to Congress' recent amendment of the ICA because of the "difficulties inherent in relying upon subsequent legislative history." Sullivan v. Finkelstein, 496 U.S. 617, 628 n. 8, 110 S.Ct. 2658, 2665 n. 8, 110 L.Ed.2d 563 (1990) (citing United States v. United Mine Workers of Am., 330 U.S. 258, 281-82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947)). However, I note that the subsequent legislative developments support my interpretation. Specifically, in 1990 Congress amended the ICA to authorize regulations imposing upon the states the duty of refunding the interest earned on federal grants prior to their disbursal. See P.L. No. 101-453, 104 Stat. 1058 (1990) (codified at 31 U.S.C.A. § 6503(c)(1) et seq. (West Supp.1993)). The House report accompanying the amendments to the ICA commented:
 Currently, the Intergovernmental Cooperation Act permits a State to retain for its own purposes any interest earned on Federal grant funds transferred to the States 'pending its disbursement for program purposes.' Thus, where a State draws down Federal funds in advance of payment to program beneficiaries, the State may invest the funds to earn income for the use of the State.
 H.R.Rep. No. 101-696, 101st Cong., 2d Sess. 5 (1990), reprinted in 1990 U.S.C.C.A.N. 1691, 1693. This interpretation of the unamended version of the ICA as well Congress' decision to amend the ICA in order to reach the result the majority reaches--requiring states to return pre-disbursal interest--comports with my conclusion that the ICA, before its 1990 amendments, allowed states to retain such interest.