# United States Court of Appeals

## For the First Circuit

No. 02-1393

UNITED STATES OF AMERICA,

Appellee,

v.

FLOR DE MARÍA CACHO-BONILLA,

Defendant, Appellant.

No. 02-1394

UNITED STATES OF AMERICA,

Appellee,

v.

WALDEMAR PÉREZ-QUINTANA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Fusté,* District Judge.

_____

*Of the District of Puerto Rico, sitting by designation.

Rafael Castro-Lang, with whom Jorge L. Arroyo-Alejandro was on consolidated brief for appellant Waldemar Pérez-Quintana.

Jorge L. Arroyo-Alejandro, by appointment of the court, with whom Rafael Castro-Lang was on consolidated brief for appellant Flor De María Cacho-Bonilla.

Nina Goodman, Appellate Section, Criminal Division, Department of Justice, with whom H.S. García, United States Attorney, was on brief for appellee.

April 14, 2005

**BOUDIN**, **Chief Judge**.  The defendants-appellants--Flor de Maria Cacho Bonilla ("Cacho") and Waldemar Perez Quintana ("Perez")--were convicted by a jury of offenses relating to the misuse of  program funds provided by the federal government.  The background events and transactions are complex but we will set the stage with a brief version, reserving details for the discussion of specific claims of error.

Acción Social de Puerto Rico, Inc. ("ASPRI") was a non-profit corporation providing services in Puerto Rico to the elderly, homeless persons and needy children.  Cacho was ASPRI's executive director and Perez the associate director.  Between 1988 and 1997, ASPRI received $60 million in federal funds under two federal programs; in each program, the Department of Health and Human Services distributed the funds to a Puerto Rico government agency which in turn distributed them to ASPRI as a subgrantee.

In 1988, without the approval of ASPRI's board of directors, Cacho and Perez formed the Center for Education and Community Services, Inc. ("the Center") as a non-profit charitable organization, naming themselves and a third ASPRI manager as the directors of the new charity. Also without the approval of ASPRI's board, defendants then undertook a set of transactions whereby ASPRI funds were employed to generate funds for the Center.  In the period 1990-1991:

> • Cacho created well-funded checking accounts
> for ASPRI, directing that the interest

generated be deposited in Center bank accounts.

• Cacho transferred over $400,000 from an ASPRI bank account to a Center bank account.

• Cacho purchased certificates of deposit in ASPRI's name and with its funds and then used at least one of the CDs as collateral for lines of credit for the Center.

• Cacho obtained loans for the Center, representing in at least one of the applications that the Center received a substantial amount of monthly interest from ASPRI funds.

In addition to the bank-related transactions, Cacho and Perez directed ASPRI employees to buy food and medical equipment through the Center instead of buying directly from distributors as ASPRI had previously done; later, the purchases were made though the Center "doing business as" fictitious entities. The purchases had markups of 20 to 30 percent, and payments from ASPRI were deposited in the Center's bank account. Yet ASPRI employees did most of Center's work in purchasing and reselling supplies.

At the defendants' direction, the Center bought a number of properties (including one bought from Perez' brother), other assets and a recycling business named Corpurimetal. Perez' son was hired by the Center to pick up food that suppliers had previously delivered for free or for less than Perez' son was paid. Credit cards or checks of ASPRI and the Center were used to pay personal expenses of Cacho and Perez, supplying money for items such as a cruise, personal clothing and restaurant bills.

-4-

In July 1997, Cacho and Perez were indicted and, after a four-month trial from April to August 2000, both defendants were convicted of conspiracy to commit theft from a program receiving federal funds, 18 U.S.C. §§ 371, 666(a)(1)(A) (2000) (count 1), theft from a program receiving federal funds, 18 U.S.C. § 666(a)(1)(A) (2000) (count 2), and mail fraud, 18 U.S.C. § 1341 (2000) (count 4). The jury also convicted Cacho of making a false statement to secure a bank loan. 18 U.S.C. § 1014 (2000) (count 3). Finally, the jury found criminally forfeit thirteen parcels of real property, allegedly derived from the embezzled funds. 18 U.S.C. § 982(a)(2)(A), (4) (2000) (count 5).

On this appeal, the defendants do not challenge their convictions for conspiracy and theft from a program receiving federal funds, but Cacho says that there was insufficient evidence to convict her for a willful false statement, and both defendants say that the evidence did not support the mail fraud conviction. Cacho and Perez also both object to the "amount of loss" calculation used by the district court to compute their sentence under the guidelines. Finally, Perez contests the forfeiture of one of the parcels of property.

We start with count 3, which charged Cacho with making a false statement to the Royal Bank of Puerto Rico on October 23, 1990, in order to procure a bank loan for the Center. The indictment charged that Cacho had stated that interest from the

funds in the ASPRI accounts were not "federal funds" and that the Center could use the interest from those ASPRI account funds. Cacho does not contest that she made these representations; but she says that the statement was true and in any event she believed it.

Cacho sought a judgment of acquittal on this count which the district court denied. On appeal, she asserts that interest on the funds in the ASPRI accounts belonged to ASPRI, did not have to be returned to the federal government and thus did not constitute federal funds.[2] The question is complicated and turns upon a reading of a now-superceded federal statute and related administrative interpretations.

The statutory provision that governed in this case provided on October 23, 1990, when the representation was made, as follows:

> Consistent with program purposes and regulations of the Secretary of the Treasury, the head of an executive agency carrying out a grant program shall schedule the transfer of grant money to minimize the time elapsing between transfer of money from the Treasury and the disbursement by a State, whether disbursement occurs before or after the transfer. <u>A State is not accountable for interest earned on grant money pending its disbursement for program purposes</u>.

31 U.S.C. § 6503(a) (1988) (emphasis added).

---

[2]The parties and the district court have treated the indictment's term "federal funds" as meaning funds that belong to or are owed back to the U.S. government. We accept this view for present purposes without considering other possible readings of the phrase in this or in other contexts.

The legislative history indicates that the drafters expected that the timing instructions directed by the first sentence would ensure that interest accruing to the state from undistributed funds would be small, which justified relieving the states of the burden of returning the accrued interest. S. Rep. No., 90-1456, at 15 (1968). Prior precedent of the Comptroller General, reversed by legislation, had said that all accrued interest had to be returned to the federal government. See Commonwealth of Pa. Off. of the Budget v. Dep't of Health & Human Servs., 996 F.2d 1505, 1510 (3d Cir.), cert. denied 510 U.S. 1010 (1993).

Although the statute says that "[a] State is not accountable" and so does not by its terms apply to funds held by subgrantees like ASPRI, it would be odd to treat as "federal funds" interest on grantee accounts that the states were not required to return. In any event, the Comptroller General explicitly concluded that "subgrantees of Federal grants to the States are entitled to keep any interest they may earn on advances from the States." 59 Comp. Gen. 218 (1980); see also 6 Op. Off. Legal Counsel 127, 132 (1982). One reason was that to require subgrantees to owe interest back to the federal government would effectively reimpose on the states the administrative burdens of dealing with interest that the final sentence of the statutory provision relieved. See 59 Comp. Gen. 218; 6 Op. Off. Legal Counsel at 132-33.

-7-

The government does not dispute the exemption's extension to states' subgrantees but argues that the interest in this case generated by ASPRI's surplus was not being held "pending distribution for program purposes." In denying Cacho's motion for judgment of acquittal, the district judge agreed; he said that the funds were being held in certificates of deposit to generate funds for Cacho and Perez' private expenses and to be invested in real estate--which was not a function permitted to ASPRI nor solely for the benefit of ASPRI clients.

We think that the cleaner reading of the federal statute is that Congress disclaimed federal ownership of interest generated once program funds were in the hands of the state or (by extension) its subgrantee and so potentially available for program purposes. Temporary storage of the funds in the short-term CDs owned by ASPRI is consistent with such a legitimate use. Congress may have expected prompter pay-outs by states or subgrantees but the statute does not make this a condition of the state or subgrantee retaining ownership of the interest.

Similarly, we do not think that the defendants' secret malign purpose to divert that interest after it was earned solves the government's problem. The thrust of the final statutory sentence quoted above was to leave the interest in the possession of the state or its subgrantee; it would be a forced reading of the statute, and one hard to administer, to deprive the state or

subgrantee of its ownership claim to the interest because of an officer's secret intent to steal the interest for his or her own use. We note that Congress has since amended the law to provide for repayment of interest on program accounts. See 31 U.S.C. § 6503(c) (2000). Count 3 did not affect either Cacho's sentence or the forfeitures.

Curiously, this does not dispose of count 3, which charged two representations. Although the interest payments were not federal funds, Cacho was also charged in the same count with falsely representing that the interest payments could be used by the Center. This was material, since the purpose of the representation was to assure the bank that the Center had a legitimate income stream to support the loan, and it was likely false. If we knew that the jury had rested its verdict on this second representation, any misconstruction of the statute pertinent to the first representation might be harmless error.

The government's position at trial was indeed that the Center had been created as a vehicle to conceal a systematic plan of embezzlement; if this were so, ASPRI interest (one could argue) could not be lawfully transferred the Center and Cacho would know that to be so. From a review of the closing arguments, the government did in fact base its embezzlement case in counts 1 and 2 on just such a theory, while the defendants sought to put forward legitimate reasons for forming the Center. Conceivably, the jury

-9-

accepted this view as to counts 1 and 2 and also carried it over as a basis for convicting on count 3 without regard to whether the interest was federal funds.

However, the government makes no such harmless error argument on this appeal, concentrating solely upon the federal funds representation, so the defendants have had no chance to respond to any harmless error claim. Further, the claim depends on a parsing of what the jury inferably found as to the nature and purpose of the Center; there were narrower bases for finding violations of 18 U.S.C. § 666(a)(1)(A) based on the condemnation of particular expenditures. So we will not sustain count 3 <u>sua sponte</u> on grounds of harmless error.

Accordingly, the alleged federal funds misrepresentation should not have gone to the jury but the other representation certainly could have been submitted alone. The bank loan conviction seemingly had no effect on the sentence or forfeiture, so the government would be entitled to retry Cacho on the second representation. Since only the $50 assessment for each felony conviction appears to turn on the issue, we assume the government will abandon the matter on remand.

Turning next to count 4, the indictment charged that for purposes of a scheme to embezzle funds from ASPRI, the defendants caused the mailing to the Department of Health and Human Services of "information contained in monthly expense reports of ASPRI which

represented as legitimate expenses inflated prices" for goods and services. This count was based on the mailing by the Puerto Rican grantee agency to HHS of an annual survey summarizing the expenses and program activity of organizations such as ASPRI receiving federal funds.

The defendants say that the evidence to support this count was insufficient and that their motion for judgment of acquittal should have been granted. Our review of the denial is de novo, drawing inferences and resolving credibility issues in favor of the verdict. United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002). However, in this case the dispute is less one of evidence than of legal characterization.

The elements of mail fraud are a scheme or artifice to defraud, specific intent, and use of the mail in furtherance of the scheme. United States v. McCann, 366 F.3d 46, 51 (1st Cir. 2004), petition for cert. filed, No. 04-5632 (U.S. Aug. 2, 2004). Only the last of these three elements is at issue here. As to the use of the mails, the defendant need not personally mail anything so long as it is reasonably foreseeable that the mails will be used in the ordinary course of business to further the scheme. United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004).

Here, a state agency official testified that ASPRI was required to submit monthly reports to the state agency and that the reports submitted included the amount paid by ASPRI to the Center

-11-

for food and supplies, including the markups that the government charged were part of the fraud. Although ASPRI submitted the reports by messenger, the state agency compiled them into a summary report--which itself reflected the allegedly fraudulent markups--that was mailed at HHS's instruction to a compiling entity that collected the data for HHS.

On this appeal, the defendants assume that the jury could find that the mailing was foreseeable but they say that the mailing played no causative role in the embezzlement scheme. The connection between the scheme and the mailing is unusually thin and the count would better have been omitted. But charging decisions belong to the prosecutor, see United States v. DeCologero, 364 F.3d 12, 22-23 (1st Cir. 2004), and in this instance the circumstances permitted conviction, although barely so.

The courts have generously construed the "furtherance" requirement. The Supreme Court has said that to satisfy this requirement, "the use of the mails need not be an essential element of the scheme." It is enough "for the mailing to be incident to an essential part of the scheme or a step in [the] plot." Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (alteration in original) (internal quotation marks and citations omitted).

The defendants' embezzlement scheme was not a one-shot affair. Much of the scheme--e.g., the mark-ups on Center purchases--depended upon the continuation of federal funding for

-12-

ASPRI.  In turn, the submission (by mail) of ASPRI data to HHS's data-collection entity perpetuated the relationship that kept funds flowing to ASPRI--or so the jury could have found from the testimony of the government's witness.  So viewed, the perpetuation was essential to the scheme and the mailing was incidental to that perpetuation.

Schmuck is analogous.  There, a defendant tampered with car odometers and sold them to dealers who, upon resale to customers, mailed title registration papers to the state.  Schmuck, 489 U.S. at 707.  The mailings were held to be "in furtherance of" the continuing fraud because they were an essential step in completing the final sales, which were in turn necessary to continue the defendant-dealer relationship and for the defendant to sell more tampered with cars.  Id. at 711-12.

The defendants say that including the improper markups as expenses was more likely to disclose the fraud to HHS than to perpetuate it; the government says that an honest disclosure of the markups would have revealed the fraud.  But as with the title registrations mailed in Schmuck, the data surveys reporting the transactions--whether accurately or inaccurately--arguably contributed to HHS's continued supplying of funds to Puerto Rico and ASPRI without too much scrutiny as to where the money was going.

-13-

The defendants rely upon <u>Parr</u> v. <u>United States</u>, 363 U.S. 370, 391 (1960), as holding that "legally compelled mailings" cannot be the basis for a mail fraud conviction. That case in pertinent part involved a school district that raised funds through its taxing power--funds thereafter embezzled by school officials. The taxing, which was legitimate, involved use of the mails; the later embezzlement did not. Over a strong dissent by Justice Frankfurter, for himself and Justices Harlan and Stewart, the Court ruled that the use of the mails was not in furtherance of the fraud.

<u>Parr</u> can be distinguished on its facts, but in truth, <u>Schmuck</u>'s "perpetuation" theory could arguably have been used in <u>Parr</u>. <u>Parr</u>, 363 U.S. at 397-401 (Frankfurter, J., dissenting).[3] However, <u>Schmuck</u> is the later case, its perpetuation theory has been regularly followed in this circuit, <u>e.g.</u>, <u>Pimental</u>, 380 F.3d at 588-89; <u>United States</u> v. <u>Woodward</u>, 149 F.3d 46, 65 (1st Cir. 1998), <u>cert. denied</u> 525 U.S. 1138 (1999), and it binds us now. Perhaps <u>Parr</u> today stands mainly for the view that the use of the mails legitimately to raise tax funds that are later embezzled (without use of the mails) does not thereby make the later embezzlement mail fraud.

---

[3]The government points out that the survey contained data indirectly reflecting defendants' improper markups; by contrast, the Court in <u>Parr</u> took the view that the tax filings were uncontaminated and would have been just the same regardless of whether the funds were later stolen. <u>Parr</u>, 363 U.S. at 392.

-14-

This brings us to the defendants' claims relating to sentencing.[4] For both defendants, the district court grouped together all of the counts as related (apart from forfeiture counts) and applied the guideline provision for fraud to determine the offense level. U.S.S.G. § 2F1.1 (1997). The court then determined that the defendants had inflicted losses on ASPRI in the amount of $1,419,482, representing the following:

- $705,059 in interest funds transferred to the Center from ASPRI accounts;

- $146,581 in markups on medical equipment and $459,807 in markups on food purchased by ASPRI through the Center; and

- $108,035 representing a payment by ASPRI to Corpurimetal.

The fraud guideline keys the offense level to the net loss inflicted and, under the guideline table, a loss of more than $800,000 (but no more than $ 1.5 million) results in an initial offense level of 17. U.S.S.G. § 2F1.1(b)(1)(L). After further adjustments not here at issue (e.g., for obstruction of justice by Cacho), the offense level for Cacho was fixed at 27 and for Perez at 23, leading to sentences of 70 months and 46 months respectively.

_____

[4]The 1997 guidelines were used, without dispute from either side, to avoid ex post facto concerns arising from later changes adverse to Cacho and Perez. See United States v. Parsons, 141 F.3d 386e, 392 n.1 (1st Cir. 1998). Today, the fraud guideline has been consolidated into the guideline for theft.

-15-

On appeal, defendants contest several of the loss calculations. We review for clear error the district court's factual findings. United States v. Gilberg, 75 F.3d 15, 19 n.3 (1st Cir. 1996); United States v. Goodchild, 25 F.3d 55, 64 (1st Cir. 1994). However, guideline interpretation, which includes the method by which the loss is computed, see United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000), is subject to de novo review. Id.; Gilberg, 75 F.3d at 19 n.3.

First, and most broadly, defendants say that the total loss figure found by the district court should be reduced by the $1.1 million recovered from the sale of forfeited properties which were themselves purchased with the embezzled funds. However, loss is intended crudely to measure the magnitude of the wrong. Parsons, 141 F.3d at 392. The defendants are not made less culpable merely because a portion of the stolen goods was later recovered.

Accordingly, it is the rule in this circuit, as well as others, that even a return of fraudulently taken property to the victim does not warrant a reduction in the loss calculation where the return occurs after the crime has been discovered. Parsons, 141 F.3d at 392-93; United States v. Downs, 123 F.3d 637, 643 (7th Cir. 1997); United States v. Mummert, 34 F.3d 201, 204 (3d Cir. 1994). Here, of course, the forfeited property was taken by the United States and not returned to ASPRI; but in any event the

-16-

amount embezzled would not be reduced by any later fortuitous recovery by ASPRI.  See United States v. Bright, 353 F.3d 1114, 1119 (9th Cir. 2004).

There is no force to defendants' attempted analogy to fraudulent loan cases where, in calculating loss under the guideline, the loan's face value is reduced by the value of pledged assets.  U.S.S.G. § 2F.1.1 application note 7(b); United States v. Kelley, 76 F.3d 436, 439 (1st Cir. 1996).  In such a case, the amount actually at risk is the unsecured amount.  In this case the payments by ASPRI to the Center used in calculating the loss were unsecured so far as ASPRI was concerned.

Second, the defendants say that they should have been given credit against the interest transfers and other wrongful losses they inflicted for the value of the properties they purchased in the Center's name because those properties (or most of them) were used (at least in some measure) for the benefit of ASPRI's programs.  For example, a number of the properties owned by the Center were used by ASPRI as centers for the elderly, camps for children and sites for work programs.  The defendants' notion is that some of what was embezzled was used for the victim's benefit.

Aside from the fact that the Center charged ASPRI rent for some of these properties, the district court did not have to credit the defendants with the supposed benefit to ASPRI.  Where fraud consists of selling an item that is worth less than

-17-

represented, the guidelines and case law do permit loss to be calculated as the inflated purchase price less the real value to the purchaser. U.S.S.G. § 2F1.1 application note 7(a)-(b); United States v. Vivit, 214 F.3d 908, 914-15 (7th Cir.), cert. denied 531 U.S. 961 (2000). But in such cases the purchaser did seek to buy the stock or watch or car, so the overcharge, rather than the purchase price, may be a fair measure of loss.

The present case is quite different. ASPRI's board did not agree to have the defendants divert ASPRI funds to purchase properties through their straw organization. And each act of embezzlement placed ASPRI's funds in jeopardy even if some of the money was spent for purposes ASPRI could have approved. In embezzlement as in theft, "loss is the value of the money, property, or services unlawfully taken," except in special cases like exchanges involving misrepresented value or pledged assets. U.S.S.G. § 2F1.1 application note 7.

Third, as already noted, $606,388 of the loss comprised markups on food ($459,807) and medical supplies ($146,581) purchased by the Center for ASPRI clients. The district court's view was that channeling the purchases through the Center provided no value to ASPRI, that the purchasing was conducted by ASPRI employees, and that the markups were part of the scheme to syphon ASPRI money into the defendants' hands. The defendants say this finding was clearly erroneous.

There was substantial testimony that the medical purchases were made from the same suppliers as before and that ASPRI employees continued to do the same work. The suppliers continued to deliver supplies to ASPRI's various locations just as they had before the Center's existence (and in any event they didn't charge for this). If there were some discrepancies in the testimony, the evidence as a whole amply supported the district court's view that the markups on the medical supplies were payment for nothing.

In reaching this conclusion, the district court implicitly rejected Cacho's testimony that purchasing medical supplies through the Center did serve a useful purpose. She had claimed at trial that the markups were necessary to fund advance purchases of medical supplies, making the supplies readily available upon need; red-tape restrictions, she said, made it infeasible for ASPRI to order in advance of need.

In fact, the court was free to disbelieve Cacho's explanation. The markups were charged on all purchases; they were not halted when money had been accumulated for a revolving fund for advance purchases. The district court's obstruction of justice adjustment rested in part on its finding that Cacho had perjured herself at trial.

Cacho and Perez have a better argument that the markups on food had some plausible function. For food distribution, the

Center incurred substantial costs in hiring Angel Perez to pick up and deliver food and in operating a warehouse with refrigeration equipment. The testimony from several witnesses indicates that at least some of these costs were justified in alleviating the difficulties of direct supplier distribution that were described in some detail at trial.

We need not consider any countervailing evidence or consider whether the food markups are otherwise tainted. Taking together the $705,059 from interest transfers and $146,581 from medical supply markups, the amount of loss already exceeds the $800,000 required to affirm the district court's eleven-level enhancement under U.S.S.G. § 2F1.1(b)(1)(L). This also makes it unnecessary to consider the separate loss element based on payments to Corpurimetal.

The last claim of error is made by Perez alone. He concedes that one among the many forfeited properties was obtained by him from the Center (the Barrio Beatriz property), but he says that this property was received in exchange for a piece of property that he and his wife had previously owned and that was itself untainted (the Barrio Vega property). So despite its connection to the Center, Perez says that the Barrio Beatriz property was not the fruit of the embezzlement and should not have been taken from him.

The government points to evidence that the Barrio Vega property was itself purchased in part from funds arguably secured

through part of the same embezzlement scheme and that anyway Barrio Beatriz was acquired by the Center with embezzled funds before Perez acquired it. We need not venture into this thicket. Perez admits that this argument was never advanced in the district court and, if there was error, it certainly is not plain to us. See United States v. Olano, 507 U.S. 725, 732 (1993).

Cacho and Perez finally present challenges to the use of the guidelines (particularly the enhancements) in their sentencing, relying on Blakely v. Washington, 124 S. Ct. 2531 (2004), and United States v. Booker, 125 S. Ct. 798 (2005). Although the defendants did not raise the issue below (and thus their claim is reviewed for plain error only) or in their initial brief, we invited them to make the plain-error showing contemplated by United States v. Antonakopoulos, 399 F.3d 68, 75 (2005); and United States v. Heldeman, __ F.3d __, 2005 WL 708397 (1st Cir. Mar. 29, 2005), that there was a "reasonable probability" that the district court would impose a more favorable sentence under the new advisory-guidelines regime.

The gist of Cacho and Perez's argument was that the district judge used some language suggesting he felt constrained by the guidelines, see, e.g., Heldemann, 2005 WL 708397, at *3, and that there were several other factors that might have led the district court to impose a lower sentence had he been at liberty to consider them in an advisory-guidelines regime. Principal among

these factors were contentions that the embezzlement from ASPRI was a single instance of aberrant behavior and that the defendants had distinguished records of public service.

That the crime was an instance of aberrant behavior is a permissible consideration for a departure (and under the 1997 guidelines, was encouraged,[5] see United States v. Grandmaison, 77 F.3d 555, 560-61 (1st Cir. 1996)); U.S.S.G. Ch. 1, pt. A, subpt. 4(d) (1997)).  Nothing suggests that the district court thought itself barred from considering it; and indeed the district court rejected this grounds for departure on the merits.  Although the commission of multiple acts during or leading up to a single crime may not bar availability of an aberrant behavior departure, see Grandmaison, 77 F.3d at 563, the district court correctly concluded that Cacho and Perez's embezzlement--executed over many years through a variety of methods--was not a single act of aberrant behavior.  There is no reason to think that the district court under an advisory guidelines scheme would impose a lighter sentence on this proffered ground.

As for public service, which was a permitted but discouraged ground for departure, U.S.S.G. § 5H1.11 (1997); United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994), the problem is similar.  Cacho and Perez engaged in admirable work, but the

---

[5]As of November 1, 2000, "aberrant behavior" has been governed by its own guidelines provision, which fleshes out the requirements and makes it a discouraged departure.  See U.S.S.G. § 5K2.20 (2000).

ultimate victims of their embezzlement were ASPRI's needy beneficiaries.  And while their careers may have involved public service that both preceded and followed the period of their crime, their good works are still significantly offset by the fact that they victimized the charitable organization that they ran.

In any event, the district judge did not disregard their public service; he made a judgment and took it into account by sentencing at the bottom of the guidelines range.  Unlike cases in which the judge expresses a desire to give a lower sentence but thinks himself constrained, the district judge in this case gave no indication that he would have gone further if he could, or that the defendants' net public contribution was insufficiently credited by the sentences given.

As for the claim that the judge perceived himself to be restricted by the guidelines but failed to say so, there might well be cases in which the judge failed to express a desire to sentence outside the guidelines range because it was useless to say anything.  See Heldeman, 2005 WL 708397, at *3.  But of those factors that could justify greater leniency that the defendants point to on appeal, the judge considered and rejected one; and seemed to take the other into account to his satisfaction.[6]

---

[6]In the district court, the defendants presented other reasons for departures below the guidelines range--such as illness and rehabilitative potential--but except by way of cross-reference to their sentencing filings do not mention them on appeal.

Finally, having given the defendants what he deemed the benefit of the doubt on the intricate amount-of-loss calculation and by imposing a sentence at the bottom of the range, the district judge went out of his way to indicate that he thought Cacho and Perez received just sentences. After saying "I have provided every break that I could," for instance, he concluded "I, therefore, feel that it is enough." And after noting that the defendants "undertook actions which were clearly illegal with the purpose of obtaining financial gain," he concluded that the "behavior merits a sentence reflective of the seriousness of the offense conduct and to provide just punishment."

The conviction of Cacho on count 3 is <u>vacated</u> but the judgment of conviction on the remaining counts and the sentences and forfeitures are <u>affirmed</u>. The matter is remanded for correction of the judgment on count 3, removal of the special assessment on that count and possible retrial on count 3 if the government is so minded.

<u>It is so ordered.</u>