The State of ALABAMA, Plaintiff,

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.

Civil Action No. 99–A–271–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 15, 2000.

Billington M. Garrett, Office of the Attorney General, Montgomery, AL, Jerry Carpenter, Alabama Department of Finance, Montgomery, AL, Malcolm J. Harkins, III, William R. Cowden, Proskauer Rose LLP, Washington, DC, for plaintiff.

Kenneth E. Vines, Redding Pitt, U.S. Attorney, U.S. Attorney's Office, Montgomery, AL, Bruce R. Granger, U.S. Department of Health & Human Services, Atlanta, GA, David W. Ogden, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Sheila M. Lieber, John R. Griffiths, U.S. Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, Elise Harris, U.S. Department of Health & Human Services, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

The State of Alabama ("Alabama") appeals an administrative decision by the Departmental Appeals Board ("DAB") upholding Donna E. Shalala's (the "Secretary") decision in her capacity as Secretary of the United States Department of Health and Human Services ("HHS") to disallow certain costs paid to Alabama by the federal government. In particular, Alabama challenges the Secretary's decision that Alabama violated federal cost principles contained in OMB Circular A–87 ("OMB A–87" or "the Circular") by transferring funds from Alabama's State Insurance Fund ("SIF") to the state treasury for purposes unrelated to the SIF. Alabama seeks declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

After careful review of the administrative record and consideration of the briefs and oral argument of the parties, together with applicable law, the court finds that,

for the reasons to be discussed, the DAB's decision is due to be AFFIRMED.

## II. FACTS AND PROCEDURAL HISTORY

### A. The SIF

In 1923, Alabama established the SIF to insure government owned buildings from arson, vandalism, burglary, other man-made disasters, and natural disasters. Ala.Code §§ 41–15–1–41–15–13. The SIF insures all state owned property in Alabama. Alabama law also allows local governments to purchase property insurance coverage from the SIF. Many of the state and local agencies which have SIF coverage received funds from federal grants and used those funds to pay a portion of their SIF premiums.[1] The exact portion of the SIF premiums paid by federal funds varies among the different state and local agencies.

In order for a state to receive federal financial participation for centrally-administered costs, such as a self-insurance fund or pension plan, the state must submit a Cost Allocation Plan ("CAP"). A CAP is "a narrative description of the procedures that the State agency will use in identifying, measuring, and allocating all State agency costs incurred in support of all programs administered or supervised by the State agency." 45 C.F.R. § 95.505. In essence, the CAP identifies the central support services that qualify for federal financial participation and describes how central support agencies allocate the costs. Alabama entered into a number of CAP agreements with HHS during the relevant time period. Each of the CAP agreements listed the SIF as a central support service

that qualified for federal financial participation. The CAP agreements also provided that the centrally administered costs must satisfy the Circular's requirements.

### B. OMB Circular A–87

The United States Bureau of the Budget originally issued the Circular, which was first called the Budget Bureau Circular A–87. *Board of Trustees of Pub. Employees' Retirement Fund v. Sullivan,* 936 F.2d 988, 991 (7th Cir.1991). In 1970, the newly-created Office of Management and Budget ("OMB") gained authority over the Circular, which then became known as OMB Circular A–87. Exec. Order No. 11,-541, § 1(a), (b), 35 Fed.Reg. 10,737 (July 1, 1970), *reprinted in* 31 U.S.C. § 501. In 1973, the functions covered in OMB Circular A–87 were transferred to the General Services Administration ("GSA") and, in 1974, the GSA reissued the Circular as the Federal Management Circular ("FMC") 74–4. Exec.Order No. 11,717, § 1, 38 Fed. Reg. 12,315 (May 9, 1973), *reprinted in* 31 U.S.C. § 501. In December of 1975, these functions were returned to the OMB, but the OMB continued to use the FMC 74–4 designation until 1981. Exec.Order No. 11,893, §§ 1 & 4, 41 Fed.Reg. 1040 (Dec. 31, 1975), *reprinted in* 31 U.S.C. § 7103. In 1981, OMB reissued the Circular as OMB Circular A–87. 46 Fed.Reg. 9548 (Jan. 28, 1981).[2]

The Circular "sets forth principles for determining the allowable costs of programs administered by State, local, and federally-recognized Indian tribal governments under grants from and contracts with the Federal Government." OMB A–87, Att. A, (A)(1); 46 Fed.Reg. 9548; R.

---

**1.** Alabama Department of Finance's Division of Risk Management ("DORM") determines the annual premium payments. Ala.Code §§ 41–15–2, 41–4–300. Under Alabama law, DORM must set the annual premium payments to 60% or less than 60% of commercial insurance rates. Ala.Code § 41–15–5. DORM also has the authority to establish reserves from the premiums paid to the SIF. Ala.Code § 41–15–10. The SIF reserve has

grown substantially from its inception in 1923.

**2.** The Circular was amended in 1995. The parties, however, have stipulated that if the Circular applies to the disallowance at issue, then it is the 1981 version. Thus, unless the court notes otherwise, the court will be referring to the 1981 Circular.

1673.[3] For claimed costs to be allowable under the Circular: the costs, *inter alia*, must be necessary and reasonable for the proper and efficient administration of the federal program, be allocable to the program, and be net of all applicable credits. OMB A–87, Att. A., (C)(1)(a), (g). As to premiums paid to a self-insurance fund, the Circular provides that

> Contributions to a reserve for a self-insurance program approved by the Federal grantor agency are allowable to the extent that the type of coverage, extent of coverage, and the rates and premiums would have been allowed had insurance been purchased to cover the risks.

OMB A–87, Att. B., (C)(4)(c). The Circular also permits grantees to distribute centrally-administered costs under CAPs. OMB A–87, Att. A., (J). The Circular gives HHS the responsibility to negotiate, approve, and audit CAPs submitted by the States. *Id.* at (J)(4)(a).

## C. Transfers

In 1980, the Alabama State Legislature authorized the Governor to transfer up to $25 million from the SIF reserve to Alabama's general fund to be used for Medicaid purposes. 1980 Ala.Acts 90 § 1, *repealed by* 1984 Ala.Acts 313; R. 1744–45. The statute also provided that the funds may be transferred back to the SIF, with eight percent interest, "whenever the state finance director, with the approval of the Governor, determines that there are sufficient funds in the state general fund." *Id.* Pursuant to this authorization, the State transferred $10 million from the reserve to Alabama's general fund in September of 1980, and transferred an additional $8,260,000, in September of 1983. On September 24, 1986, the Alabama State Legislature ordered another transfer of $25 million from the SIF reserve to various state or-

ganizations.[4] 1986 Ala.Acts 645 § 1; R. 1747–49. Originally, the 1986 statute required Alabama to repay the transferred funds within the next fiscal year. 1986 Ala.Acts 645 § 2. The Legislature, however, repealed the 1986 statute and passed a new law that states that the funds "may be transferred back to the state insurance fund from the state general fund, whenever the state finance director, with the approval of the governor, determines that there are sufficient funds in the state general fund." 1987 Ala.Acts 809 § 2; R. 1750–51.

## D. The Disallowance and the Appeals

In 1990, the Office of Inspector General ("OIG"), with the support of HHS's Division of Cost Allocation ("DCA"), decided to audit the SIF. OIG contracted with the outside accounting firm of Carmichael, Ingle, Saffer & Brasher, P.C. ("HHS Accountants") to conduct the audit. R. 1716. The HHS Accountants issued a report (the "Carmichael Report") on April 15, 1991, covering the SIF for fiscal years 1977 to 1987. R. 1716. According to the Carmichael Report, Alabama had accumulated excess funds in its reserve. R. 1721. Additionally, the HHS Accountants determined that the transfers of funds from the SIF reserve to the State's general fund "were not allowable uses of Federal funds." R. 1721.

In determining the appropriate disallowance amount, the Carmichael Report estimated that state agencies paid 49% of the SIF's premium payments and local entities paid 51% of the SIF's premium payments. R. 1722. The report also used the government's standard estimates. The standard estimates provide that federal funds comprise 20% of the premiums paid by state agencies and 5% of the premiums paid by local entities. R. 1731. Accordingly, the

---

**3.** The court will refer to the administrative record cites as "R."

**4.** The Alabama Department of Mental Health and Mental Retardation received $12 million,

the Alabama Medicaid Agency received $11 million, and the Alabama Department of Public Health received $2 million. R. 1721 (Carmichael Audit Report at 3).

HHS Accountants recommended that Alabama return the federal share of $80,809,-879[5] which the HHS Accountants estimated to be $9,990,023. R. 1731.

After reviewing the Carmichael Report, HHS's Division of Cost Allocation ("DCA") determined that the reserve was excessive and that the transfers violated federal cost principles. R. 1767. By this time, the reserve balance had increased and the excess totaled $125,864,076 ($49,189,551 in the reserve, $43,260,000 in transferred funds, and $33,414,525 in lost interest on the transferred funds). R. 1770. In turn, the DCA issued a disallowance for $13,-780,619.[6] R. 1770.

Alabama appealed the DCA's disallowance to Dr. Thomas T. Williams, the HHS Regional Director for Region IV, pursuant to 45 C.F.R. Part 75 (1996).[7] R. 1801–06. On October 19, 1992, the Regional Director upheld the DCA's decision, but concluded that Alabama only owed $13,721,353 to the federal government because of a prior miscalculation in the actual reserve balance. R. 1806.

Alabama appealed the Regional Director's disallowance to the Departmental Appeals Board ("DAB"). The DAB "reverse[d] the disallowance for the imputed interest on the transferred funds because DCA did not show that it had authority to recover interest not actually earned on grant funds received by a state" and "reverse[d] the disallowance for the federal share of the SIF Reserve characterized by DCA as excessive, since we conclude that Alabama here demonstrated that its Reserve was within the range of reasonable reserves based on the particular circumstances of its SIF." *Alabama Dep't of Finance*, DAB No. 1635 at 2 (H.H.S.1997).

The DAB, however, upheld the disallowance based on the federal share of the reserve funds removed from the SIF by the Alabama State Legislature. *Id.* In particular, the DAB found that Alabama violated four of the Circular's cost principles when it transferred funds from the reserve to other programs: (1) that costs must be necessary and reasonable for the proper and efficient administration of the grant program; (2) that costs are allocable to a particular cost objective only to the extent of the benefits received by such objective; (3) that costs must be net of all applicable credits; and (4) that federal and state costs must be treated consistently. *Id.* at 13–14.

As to the appropriate federal share, Alabama argued to the DAB that it should adopt Alabama's federal share numbers, instead of the government's standard estimates. To support its claim, Alabama hired the accounting firm of David M. Griffiths ("DMG") to discover the actual federal share of state and local premium payments made to the SIF. DMG reviewed budgets and CAP agreements, conducted site visits, sent out questionnaires, visited or contacted the largest agencies, and sent survey letters to the remaining state and local entities. DMG concluded that the federal funds comprised 7.75 % of premiums paid by state agencies and .74% of premiums paid by local entities. The DAB adopted the DMG study as representing the actual federal share of premium payments and rejected the standard estimates offered by HHS. *Alabama*, DAB No. 1635 at 25. Consequently, the DAB concluded that the federal share of the transferred funds was approximately $3.3 million.[8]

5. The $80,890,879 constituted $30,170,086 of excess reserve, $43,260,000 in transferred funds, and $12,460,793 in interest lost because of the transfers. R. 1731.

6. According to the DCA opinion in calculating the federal share of the reserve level, Alabama did not dispute the use of the standard estimates. R. 1770.

7. This regulation was eliminated in 1997, and now appeals go directly to the Departmental Appeals Board. 62 Fed.Reg. 38,217 (July 17, 1997).

8. Alabama paid HHS $3,467,824.97 in January of 1998 to prevent further interest accrual while they appealed DAB's final decision in this court.

On March 17, 1999, Alabama filed a complaint in this court seeking judicial review of the DAB determination. *See Bowen v. Massachusetts,* 487 U.S. 879, 883, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (holding that a district court has jurisdiction under the APA to review a disallowance by HHS).

## III. *STANDARD OF REVIEW*

The APA governs a district court's review of an administrative agency action. 5 U.S.C. §§ 701–706. According to the APA, a reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E).

The scope of review under the arbitrary or capricious standard is narrow, and the court cannot substitute its own judgment for that of the agency. Instead, the court must determine whether a rational connection exists between the facts found and the choice made. *Atlanta Gas Light Co. v. FERC,* 140 F.3d 1392, 1397 (11th Cir. 1998); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (limiting review to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). An agency decision that fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" is arbitrary or capricious. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). The reviewing court must review the entire record, including the body of evidence opposed to the agency's position. *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456. But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). The Eleventh Circuit has recently found that "[t]he substantial evidence test is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." *Fields v. United States Dep't of Labor Admin. Review Bd.,* 173 F.3d 811, 813 (11th Cir.1999).

Generally, a court must give substantial deference to an agency's interpretation of its own regulations. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). When looking at these decisions, the court's "task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Stated alternatively, the court must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988).

## IV. *DISCUSSION*

Alabama appeals the DAB's decision that upheld the government's disallowance of the federal share of funds transferred from the SIF reserve to other state agen-

cies. In particular, Alabama presents six issues for review: (1) whether the DAB reasonably found that the federal government retains an interest in funds which grantees contribute to a self-insurance fund reserve; (2) whether the DAB acted arbitrarily or capriciously in applying the Circular to the SIF; (3) whether the DAB acted arbitrarily or capriciously and in violation of the Full Faith and Credit clause and principles of federalism in not characterizing the transfers of funds as loans; (4) whether the DAB's determination of the federal share is supported by substantial evidence; (5) whether HHS followed the APA's rulemaking procedures in promulgating the Circular; and (6) whether the McCarran–Ferguson Act prohibits the application of the Circular to the transfers of funds from the SIF reserve to Alabama's general fund. After a thorough review of the administrative record and the parties' briefs, the court affirms the agency's decision.

## A. Application of the Circular

The threshold question before the court is whether the Circular applies to the SIF reserve. In addressing this question, the court must first determine whether the DAB reasonably determined that the federal government retained an interest in the federal funds used to purchase insurance from the SIF. If the court finds that the federal government retained an interest, then the court must determine whether the DAB reasonably found that the Circular imposes obligations on the State and the SIF to account for those federal funds. Alabama also contends that the DAB may not disallow the federal share of the transferred funds because Alabama had no notice of this rule.

### 1. Federal Character

■ Alabama argues that the DAB unreasonably interpreted the Circular as per-

mitting federal funds to retain their federal character after being contributed to a state self-insurance reserve, thereby limiting the manner in which a self-insurance fund could dispose of its reserve. This issue boils down to whether a court should examine the disposition of federal funds at the time a particular grantee spends them or at the time a self-insurance fund spends them. The Circular does not expressly address this issue.

■ Alabama asserts that because the Circular permitted the grantees' annual premium payments to the SIF, the grantees satisfied the Circular's cost principles. St.Br. at 68. According to Alabama, the Circular covers costs incurred by grantees, and allows a grantee to purchase insurance coverage as long as the coverage is a "sound business practice." OMB A–87, Att. B., (C)(4)(b)(1). In particular, the Circular allows grantees to use federal funds to purchase insurance coverage from a commercial carrier or they may contribute payments to a reserve for a self-insurance program. *Id.* at (C)(4). In this case, the grantees contributed payments to a reserve for a self-insurance program administered by the SIF. "Contributions to a reserve for a self-insurance program approved by the Federal grantor agency are allowable to the extent that the type of coverage, extent of coverage, and the rates and premiums would have been allowed had insurance been purchased to cover the risks." *Id.* at (C)(4)(c). Consequently, Alabama claims that so long as purchasing insurance from the SIF was a sound business practice, the Circular allows it. St. Br. at 69–70. Because the DAB found that the Circular permitted the premium costs funded by the federal government when initially incurred, Alabama asserts that it satisfied the Circular's requirements.[9] *Id.* at 70.

9. Alabama also argues that the 1995 amendments to the Circular illustrate that the 1981 version of the Circular did not regulate how self-insurance funds spent their reserves. In

1995, HHS amended the Circular to prohibit intrastate reserve transfers from a self-insurance fund. 60 Fed.Reg. 26,484, 26,499 (May 17, 1995); Revised OMB A–87, Att. B,

HHS counters by arguing that the very nature of a self-insurance fund mandates that the federal government retains rights on the funds it contributed to the self-insurance fund. Unlike other expenses, a self-insurance fund must carry a fund balance from year to year to ensure appropriate resources to cover potential insurance claims arising from unforseen events, such as destruction of property from a hurricane or a tornado. "The self-insurance funds are, in essence, contingency funds to be tapped, or disbursed, only when claims are filed against them and paid by the State."[10] *Alabama,* DAB No. 1635 at 9 (quoting *Pennsylvania Office of the Budget,* DAB No. 1234 at 9 (H.H.S.1991)).

(25)(d)(5). Alabama alleges that according to principles of statutory construction, when Congress or an agency amends a statute or a regulation it presumably intends to change the existing law. Alabama, however, misstates this principle of statutory construction. The cases Alabama relies on presume Congress intends a change when it alters the wording of the statute. *Brewster v. Gage,* 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930) ("The deliberate selection of language so differing from that used in the earlier acts indicates that a change of law was intended."); *Hiivala v. Wood,* 195 F.3d 1098, 1103 (9th Cir.1999) ("When Congress alters the wording of a statute, we presume that Congress intended a change in the law."); *Dorris v. Absher,* 179 F.3d 420, 429 (6th Cir.1999) ("Where the words of a later statute differ from those of a previous one on the same ... subject, the Congress must have intended them to have a different meaning."). When Congress adds to a statute rather than change the wording, an amendment may not necessarily indicate a change in the law. Congress may "amend a statute to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases. Thus, an amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." *United States v. Sepulveda,* 115 F.3d 882, 885 n. 5 (11th Cir.1997) (quoting *Hawkins v. United States,* 30 F.3d 1077, 1082 (9th Cir.1994)).

The 1995 amendments to the Circular do not necessarily constitute a concession by the federal government that prior to the amendment, states could transfer funds from a self-insurance fund to other state agencies. Commonwealth of *Pennsylvania, Office of the Budget v. Department of Health & Human Servs.,* 996 F.2d 1505, 1512 (3d Cir.1993). Instead, the amendments may have made more explic-

Consequently, a grantee does not know how a self-insurance fund spent the grantee's contributions until the fund actually spends them, which could occur more than a year after receipt of the contributions. The DAB concluded that this situation creates ongoing obligations by self-insurance funds, such as the SIF, to account for federal funds and to ensure that funds authorized to cover insurance premiums remain in and continue to benefit the programs which funded the self-insurance reserve. *Id.* Otherwise, the DAB reasoned that a grantee could transfer federal funds to an apparently legitimate reserve and then the state could transfer such funds

it requirements that had always existed under the cost principles and other sources of federal appropriations law. *Id.* Thus, the 1995 amendments do not necessarily indicate a change in the law. *Id.; see also Sepulveda,* 115 F.3d at 885 n. 5 (holding that subsequent amendments to the definition of "access devices" in 18 U.S.C. § 1029(e)(1) inconclusive as to the plain meaning of the pre-amendment definition).

10. Alabama argues that the DAB took inconsistent positions as to whether the SIF reserve constituted a contingency reserve. Alabama points out that the DAB stated that "[w]hile OMB Circular A–87 provides that contributions to a contingency reserve or for unforeseen events are unallowable, DCA did not here establish that the SIF Reserve could be viewed as a contingency reserve within the meaning of the cost principles." *Alabama,* DAB No. 1635 at 20; *see also* OMB A–87, Att. B, (D)(2) ("Contributions to a contingency reserve or any similar provision for unforeseen events are unallowable."). At first glance, the DAB appears to have taken contradictory positions, but an analysis of the DAB's comments reveal that it has not done so.

Based on the nature of a self-insurance reserve, the DAB correctly viewed the SIF reserve as a contingency reserve. Because the Circular expressly allows a grantee to contribute federal funds to a self-insurance reserve, the general prohibition on contributions to a contingency reserve does not apply. OMB A–87, Att. B, (C)(4)(c). As a result, the SIF reserve does not fall within the Circular's prohibition against contingency reserves. Therefore, the DAB's decisions do not conflict.

from the reserve to other state ventures not approved by the federal grant. *Id.* at 10.

In support of the DAB's decision, HHS relies on the analysis in *Pennsylvania Office of the Budget v. Department of Health & Human Services,* 996 F.2d 1505 (3d Cir.1993). In *Pennsylvania,* Pennsylvania transferred to its general fund interest earned on a self-insurance reserve account created to pay workers' compensation and health benefit claims. *Id.* at 1507. HHS sued the state to recover the federal government's share of the interest earned on the self-insurance reserve account. *Id.* The Third Circuit faced the question of whether Section 203(a) of the Intergovernmental Cooperation Act of 1968, 31 U.S.C. § 6503(a) (1988), permitted Pennsylvania to retain the earned interest. Section 203(a) provides that "[a] State is not accountable for interest earned on grant money pending its disbursement for program purposes."

To answer this question, the court had to decide whether the funds in the self-insurance reserve account were "pending . . . disbursement for program purposes." Pennsylvania argued that disbursement occurred when the grantees initially placed the federal funds into the reserve account,

not when claims are paid from those accounts. *Pennsylvania,* 996 F.2d at 1510. Basing its decision on the very nature of self-insurance funds, the DAB disagreed and found that disbursement occurred when the claims were paid from the reserve account. *Id.* at 1509–10. The Third Circuit held that both interpretations were reasonable.[11] *Id.* at 1510; *see also Oklahoma Office of State Fin.,* DAB No. 1668 at 4 (H.H.S.1998) (finding that Oklahoma had a continuing obligation to ensure that federal funds authorized to cover health insurance premiums remain in the insurance reserve fund); *Texas Office of the Governor,* DAB No. 1608 at 6 (H.H.S.1997) (finding that the federal government had a reversionary interest in federal funds paid into a state health insurance plan).

The court agrees with *Pennsylvania* in that both Alabama and the DAB present reasonable interpretations of the Circular. Although the court recognizes the potential merit to Alabama's argument, the court finds that the DAB's decision to treat federal funds in the SIF reserve as disbursed when the SIF spent the funds and not when the grantees initially contributed the federal funds to the SIF as reasonable and not arbitrary or capricious.[12] *Muratore v. United States Office*

---

**11.** The Third Circuit did not review the agency's decision under the arbitrary or capricious standard because it assumed without deciding that HHS does not receive *Chevron* deference in interpreting § 203(a). *Pennsylvania,* 996 F.2d at 1509.

**12.** Alabama also asserts that the HHS did not retain an equity interest in the funds because the cost of insurance is the cost of paying premiums. Although Alabama cites a string of cases to support this position, the cases cited invalidated a HHS regulation that attempted to limit the allowable costs of malpractice insurance based on historical malpractice losses or claims. *E.g. Lloyd Noland Hosp. & Clinic v. Heckler,* 762 F.2d 1561 (11th Cir.1985); *St. James Hosp. v. Heckler,* 760 F.2d 1460 (7th Cir.1985). Accordingly, the court finds that these cases are not relevant to the issue at hand.

The court also rejects Alabama's argument that the Equal Protection and Due Process

clauses prevent the federal government from treating the SIF differently than other commercial insurers. This argument fails because a state is not a person under the Constitution entitled to protection under the Due Process clause of the Fifth Amendment. *South Carolina v. Katzenbach,* 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Likewise, the state is not entitled to protection under the Fifth Amendment's Equal Protection clause.

Additionally, Alabama contends that fundamental principles of insurance law provide that an insured does not retain an equity interest in the premiums paid to the insurer, and the insurer retains any premiums not expended. *Appeal of Bolden.,* 848 F.2d 201, 209 (D.C.Cir.1988). Consequently, Alabama asserts that the federal government does not retain an interest in contributions to the SIF reserve. This principle, however, does not apply here because the Circular provides that the SIF may not profit from federal funds.

*of Pers. Mgmt.,* 222 F.3d 918, 924 (11th Cir.2000) ("While we again recognize potential merit in each argument, Appellee's position does not render OPM's interpretation arbitrary or capricious.").

### 2. Single Unit Theory

After determining that the federal character of the funds did not disappear after the individual grantees contributed funds to the SIF, the court faces the question of who had a responsibility to ensure that the SIF spent federal funds in accordance with the Circular. Alabama contends that only the specific state agencies which received federal funds, and not the State as a whole or the SIF, had the obligation to ensure that the SIF spent the funds in accordance with the Circular's cost principles. The DAB disagreed with Alabama and held that, under the single unit theory, the Circular imposed obligations on the State and the SIF as to the expenditure of federal funds. Thus, the court must decide whether the DAB's decision to apply the Circular to the State as a whole and the SIF based on the single unit theory is arbitrary or capricious.

The single unit theory views the State and all of its agencies as a single unit responsible for the administration of grant funds. The DAB gleaned this theory in part from the definition of grantee in 45 C.F.R. § 74.3 (1981) which defines "grantee" as "the entire legal entity even if only a particular component of the entity is designated in the award document." The DAB also supported its decision on policy grounds—that a state cannot avoid accountability by merely transferring federal funds to another agency within the state and then be able to spend the funds in any way it pleases. *Alabama,* DAB No. 1635 at 10.

On appeal, Alabama argues that this decision of the DAB is arbitrary or capricious for a number of reasons. First, Alabama contends that the DAB cannot rely upon the definition of "grantee" in 45 C.F.R. § 74.3 to establish the single unit theory in this case because § 74.3 does not apply to all of the grants in question. Alabama points out that this regulation pertains only to the administration of HHS grants and not to grants provided by other federal agencies. 45 C.F.R. § 74.4(a). As a result, Alabama contends that § 74.3 does not apply to a number of the grantees who made payments to the SIF reserve and whose payments the HHS has disallowed.

As to the non-HHS grants, Alabama argues the DAB's single unit decision is arbitrary or capricious because neither the State nor the SIF fall under the Circular's definition of "grantee". The Circular defines "grantee" as "the department or agency of State, local, or federally recognized Indian tribal government which is responsible for the administration of the grant." OMB A–87, Att. A, (B)(9). The Circular further provides that a grantee "assumes the responsibility for seeing that federally-assisted program funds have been expended and accounted for consistent with underlying agreements and program objectives." *Id.* at (A)(2)(b). Neither the State nor the SIF fall under this definition of grantee.[13] Consequently, Alabama argues that the Circular imposes a duty to oversee federal funds on the particular state agency that receives the funds, but does not impose a similar duty on the state or any state agency that does not directly receive federal funds.

▮ Just because the State and the SIF do not fall within the definition of "grant-

---

OMB A–87, Att. A, (C)(1)(g). If the SIF were allowed to retain the unearned premiums and use them for purposes not related to insurance, then the SIF would illegally profit from federal funds. In addition, this principle does not apply because the agency reasonably interpreted the Circular as imposing an ongoing

obligation on the SIF as to how it spends federal funds.

**13.** The SIF does not meet this definition because it does not receive grant money from a specific grant; rather, the SIF receives grant money from the grantees.

ee," and the Circular imposes an obligation on the grantee, does not mean that the Circular does not also impose a duty on the State and the SIF. Indeed, the Circular imposes an express obligation on the State. In addition, the Circular's definition of "grant", its broad language, and its provisions dealing with CAPs support the DAB's single unit theory.

The Circular does impose an express duty on the State as a whole. In particular, the Circular states that "State, local, and federally recognized tribal governments are responsible for the efficient and effective administration of grant and contract programs through the application of sound management practices." *Id.* at (A)(2)(a). This provision imposes a duty on the State as a whole to ensure the effective administration of the grants. By doing so, this provision supports DAB's decision to adopt the single unit theory.

In addition to this express obligation, the single unit theory comports with the Circular's definition of "grant." The Circular defines a "grant" as "an agreement between the Federal Government and a State ... government." *Id.* at (B)(7). By defining a grant as a contract between the federal government and a State, the Circular acknowledges the State as the legally responsible party. To limit the legal responsibilities to only the grantee, the Circular could have used the term "grantee" with its narrow meaning, instead of using the term "State." The Circular did not do so.

Moreover, the Circular employs broad language when referring to the obligations of the State and its agencies in administering the grants. For instance, the Circular states as its objective that "[t]his attachment sets forth principles for determining the allowable costs of programs administered by State ... governments under grants from and contracts with the Federal Government." *Id.* at (A)(1). The Circu-

lar also provides that the "[t]hese principles will be applied by all Federal agencies in determining costs incurred by State ... governments under Federal grants and cost reimbursement type contracts (including subgrants and subcontracts)." *Id.* at (A)(3); *see also id.* at (B)(7) ("The principles and policies stated in the Circular as applicable to grants in general also apply to any federally-sponsored cost reimbursement-type of agreement performed by a State ... government."). By using broad language, the regulations support the notion that the State as whole has an obligation to ensure that federal funds are used in accordance with the Circular.

The Circular does not limit this broad language. Nowhere in the Circular does it expressly provide that the State as a whole has no obligations under the Circular. Nor does the Circular expressly limit obligations under the Circular to only the grantee.

As with the definition of "grant" and the broad language in the Circular, the Circular's provisions concerning CAPs support the proposition that the State and the SIF have obligations under the Circular. Subsection J of the Circular permits some costs incurred by a grantee to be administered centrally by the State through CAPs. OMB A–87, Att. A, (J). Pursuant to the Circular, the HHS, in collaboration with the other Federal agencies concerned, is responsible for negotiation, approval, and audit of CAPs, submitted to it by the states.[14] *Id.* at (J)(4)(a). "At the grantee department level in a State, a single cognizant Federal agency will have responsibility *similar* to that set forth in a." *Id.* at (J)(4)(b) (emphasis added). Here, the Circular provides that both the HHS and a federal agency have similar responsibilities in reviewing the costs a grantee and a State charge the federal government in relation to a centrally administered ser-

---

14. HHS also has the responsibility of developing and issuing instructions for grantees in preparing a CAP. *Id.* at (J)(3).

vice. By requiring HHS to approve and audit a State's CAP, the Circular implicitly requires the State to follow the Circular. This obligation becomes apparent in analyzing the actual CAP agreements between the State of Alabama and HHS.

In this case, the CAP agreements themselves provide an independent basis to find that the Circular applies. The CAP agreements explicitly provide that the centrally administered costs, including SIF's costs, must satisfy the requirements of the Circular. R. 1820, CAP for fiscal year ending Sept. 30, 1982 at ¶ 1 ("Pursuant to OMB Circular A–87, the Department of Health and Human Services approves the central service costs cited in the agreement."); *id.* at III. D. ("Such charges [from a centrally administered service] will be based on the actual, allowable costs, as defined in OMB Circular A–87, incurred by the operating department/agency responsible for providing the services."); R. 1831, CAP for fiscal year ending Sept. 30, 1984 at III. D. (same); R. 1854, CAP for fiscal year ending Sept. 30, 1987 at III. A. 2. ("Such charges represent costs incurred by the State/locality which are legal obligations of the State/locality and are allowable under OMB Circular A–87."); *id.* at III E. ("This Agreement was executed in accordance with the authority in the OMB Circular A–87 . . . .").[15] Moreover, these contract provisions follow the regulations governing CAPs. The regulations require that a CAP must conform to the accounting principles and standards prescribed in the Circular. 45 C.F.R. § 95.507(a)(2). The regulations also require a State to certify "[t]hat the information contained in the proposed cost allocation plan was prepared in conformance with [the Circular]." 45 C.F.R. § 95.507(b)(8)(i). From the contract language in the individual CAP agreements and the regulations concerning CAPs, this court finds that Alabama and the SIF have a duty to comply with the Circular.

On the other hand, Alabama presents two arguments as to why the CAP does not provide an independent basis. First, Alabama argues that the purpose of the CAP and how it distributes costs to the grantees illustrates that the Circular does not apply to the costs charged by the SIF. The CAP is an agreement as to how central service costs will be allocated among the state's various departments. 45 C.F.R. § 95.505. According to Alabama, whether the federal government will reimburse a state agency for the central service cost ultimately depends on whether the cost supports the individual objectives of the particular grant.

Once again Alabama fails to look at the broader picture, and instead, focuses on the grantee alone. At the grantee level, Alabama correctly notes that the specific federal agency that funds a particular grant has the ultimate decision whether or not to reimburse the central service cost. The SIF, however, has a duty imposed on it by the CAP and the Circular. As stated above, the CAP agreements impose an obligation on the SIF to charge costs consistent with the Circular. This obligation is separate and distinct from the grantees' obligation.

The Circular in fact recognizes these separate and distinct obligations. As noted before, the Circular divides the responsibility of negotiating, approving, and auditing central support costs submitted in a CAP and indirect cost proposals submitted by the individual grantees. OMB A–87, Att. A, (J)(4)(a) & (b). The HHS approves costs submitted by a State pursuant to a CAP, such as the SIF, *id.* at (J)(4)(a), while the cognizant federal agency has a similar duty to approve the grantee's indirect cost proposals, *id.* at (J)(4)(b). Therefore, the court rejects this argument.

---

**15.** Alabama argues that a contract cannot mandate adherence to an improperly promulgated regulation. *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1053–54 (D.C.Cir. 1987). Because the court rejects Alabama's argument that the Circular was improperly promulgated, the court rejects this argument.

Second, Alabama contends that the Circular does not apply to the SIF because the SIF was a Section II program which directly billed state and local agencies for the costs, instead of allocating the costs as in a Section I program. The distinction between a Section I program and a Section II program is a distinction without a difference. The CAP agreements explicitly provide that Section II programs must bill their costs in compliance with the Circular. R. 1820, CAP for fiscal year ending Sept. 30, 1982 at ¶ 1, III.D.; R. 1831, CAP for fiscal year ending Sept. 30, 1984 at II., III.D.; R. 1854, CAP for fiscal year ending Sept. 30, 1987 at III., III.D. Thus, this argument also fails.

In conclusion, the DAB's decision to apply the single unit theory and, consequently, find that the Circular applies to the SIF reserve was reasonable. Although Alabama and the SIF do not fall within the Circular's definition of "grantee," the Circular imposes upon the State and the SIF a duty to follow the Circular as evidenced by the Circular's express obligations, its definition of "grant", and the broad language employed by the Circular. In addition, the CAP agreements between Alabama and HHS provide a separate basis for applying the Circular to Alabama and the SIF. Therefore, the court finds that the DAB's decision to apply the single unit theory is reasonable and not arbitrary or capricious.[16] *Board of Trustees of the Pub. Employees' Retirement Fund*, 936 F.2d at 993 (HHS "possess[es] substantial latitude" in interpreting the Circular.); *New York v. Shalala*, 959 F.Supp. 614, 621 (S.D.N.Y.1997) (HHS's interpretation of the Circular is "entitled to great deference."), *aff'd*, 143 F.3d 119 (2d Cir.1998). The court also finds that it was reasonable, and not arbitrary and capricious, for the DAB to include the small amount of federal funds coming into the SIF from local governments, given the fact that Alabama assumed responsibility for the funds, through the SIF, and transferred funds out of the SIF for other state programs.

## 3. No Notice

■ Alabama contends that the Secretary cannot enforce against Alabama a previously unannounced interpretation of the Circular that imposes a limitation on self-insurance reserve transfers. The court disagrees. Problems may arise in a case which the administrative agency could not reasonably foresee and which it must solve despite the absence of a relevant general rule. *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 293, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Consequently, the Supreme Court has stated that an agency may announce "new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *Id.* at 294, 94 S.Ct. 1757; *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) ("The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate."); *Puerto Rico Aqueduct & Sewer Auth. v. EPA*, 35 F.3d 600, 607 (1st Cir. 1994) ("It is well established that agencies are free to announce and develop rules in an adjudicatory setting."); *Ka Fung Chan v. INS*, 634 F.2d 248, 257 (5th Cir.1981) ("An agency is not precluded from announcing new principles in an adjudicative proceeding.") (citations omitted).

---

**16.** Although no court has explicitly addressed this issue of whether or not the Circular applies to an agency administering a self-insurance fund, a number of courts have permitted HHS to recover against a state agency, similar to the SIF, based on the Circular. *E.g. Pennsylvania Office of Budget*, 996 F.2d at 1511 (holding the state accountable for interest earned on federal grant money located in a self-insurance reserve account); *Board of Trustees of the Pub. Employees' Ret. Fund*, 936 F.2d at 992–93 (holding the state liable to HHS where the state allocated to federal programs costs greater than those the state charged to itself for an employee pension plan).

Of course, there are limits on this freedom. As a general matter, when an adjudicating agency retroactively applies a new legal standard that departs radically from the agency's previous interpretation of the law, the agency must give entities regulated by the agency proper notice and a meaningful opportunity to adjust. *Bell Aerospace,* 416 U.S. at 295, 94 S.Ct. 1757; *Pfaff v. United States Dep't of Housing and Urban Devp.,* 88 F.3d 739, 748 (9th Cir.1996); *Puerto Rico Aqueduct,* 35 F.3d at 607. Alabama has not identified a previous interpretation of the Circular that radically differs from the Secretary's current position, nor has the court found one. Therefore, the court finds that the agency did not abuse its discretion by announcing a new rule in an adjudication.

Overall, the court finds that the DAB reasonably interpreted the Circular as permitting federal funds to retain their federal character after being contributed to a state self-insurance reserve, thereby limiting the manner in which the self-insurance fund could dispose of its reserve. Subsequently, the DAB reasonably held that the Circular applies to the continuing obligations of the SIF and that the Circular prohibited the transfer.[17]

## B. Characterization of the Transfers

■ Alabama contends that the DAB's decision to characterize the transfers of funds as transfers and not loans is arbitrary or capricious and violates the Full Faith and Credit Clause and principles of federalism. Turning to the first issue, Alabama asserts that Alabama law requires it to repay the transfers with interest. 1980 Ala. Acts 90; 1984 Ala. Acts 313; 1986 Ala. Acts 645; 1987 Ala. Acts 809. Alabama also notes that the SIF referred to the transferred funds as a loan to the State in the SIF's Annual Reports. *E.g.,* R. 6009.

The DAB, however, correctly found that the SIF has no authority to require Alabama to repay the transferred funds and that the law does not require Alabama to repay the funds. Alabama law provides, in pertinent part, that:

Such amounts as have heretofore been transferred to the state general fund from the state insurance fund pursuant to Act [Nos. 80-90 & 86-645], or any part thereof, *may be transferred* back from the state general fund to the state insurance fund, with interest at eight percent per annum, whenever the state finance director, with the approval of the governor, determines that there are sufficient funds in the state general fund.

1984 Ala. Acts 313 § 2 (emphasis added); 1987 Ala. Acts 809 § 2 (emphasis added).[18] By using the phrase "may be transferred," the statute provides the State with the discretion to decide whether or not to repay the SIF. Black's Law Dictionary 993 (7th ed.1999) (defining "may" as "Is permitted to ... This is the primary legal sense—usually termed the 'permissive' or 'discretionary' sense"); *see also Dorris,* 179 F.3d at 429 ("The use of the term

---

**17.** As to the merits, the DAB identified four cost principles that Alabama violated when it transferred funds from the reserve to other programs: (1) that costs must be necessary and reasonable for the proper and efficient administration of the grant program; (2) that costs are allocable to a particular cost objective only to the extent of the benefits received by such objective; (3) that costs must be net of all applicable credits; and (4) that federal and state costs must be treated consistently. *Alabama,* DAB No. 1635 at 7–9. For example, the DAB concluded that "[o]nce the Alabama state legislature transferred the funds out of the Reserve, the funds could no longer be considered as having been applied to the costs of insurance premiums allocable to the original federally funded programs to which they were charged." *Id.* at 2 Alabama does not contest the DAB's decision as to the merits. Consequently, the court finds that the DAB reasonably found that the transfers violated the Circular's cost principles.

**18.** Alabama did establish a deadline for repayment of the 1986 transfer in 1986 Ala. Acts 645 § 2. Alabama, however, repealed the repayment deadline and replaced it with a discretionary repayment clause. 1987 Ala. Acts 809 § 2.

'may' in a statute is generally construed as permissive rather than as mandatory."). Even if the State decides to repay the funds, the statutes give the state finance director and the governor complete discretion to decide when to repay the funds. Moreover, the State has not taken any action to return the funds to the SIF. For example, Alabama has not paid the SIF any interest on the transferred funds. Based on these reasons, the court finds that the DAB reasonably concluded that the transfers did not constitute loans.

Second, Alabama argues that HHS violated the Full Faith and Credit Clause of the United States Constitution when the DAB ignored Alabama's statutory requirement that the transferred funds be repaid. According to Alabama, as a federal administrative agency, the DAB was bound to enforce the Alabama State Legislature's enactments with "the same full faith and credit" as they have in the State of Alabama. *Midgett v. United States,* 221 Ct. Cl. 171, 603 F.2d 835, 845 (1979).[19] Alabama law, however, does not require Alabama to repay the transferred funds. Thus, the DAB did not violate the Full Faith and Credit Clause by not viewing the transfers as loans.

Third, Alabama argues that HHS violated Alabama's constitutional right to control its own fiscal affairs by not according the transfers of funds to Alabama's general fund the status of loans. *Bekins,* 304 U.S. at 51, 58 S.Ct. 811; *Ashton v. Cameron County Water Improv. Dist.,* 298 U.S. 513, 529, 56 S.Ct. 892, 80 L.Ed. 1309 (1936). The court also rejects this argument for the same reason as the other two arguments, and finds that the DAB was not arbitrary and capricious in characterizing the transfers as not constituting loans to Alabama.

## C. Federal Share

Having determined that the DAB reasonably found that the transfers violated the Circular's cost principles, the court encounters the issue of whether the DAB's calculation of the federal share of the transferred funds was supported by substantial evidence. Alabama asserts that the DAB impermissibly relied on Alabama's evidence of the federal share, failed to reduce the federal share by the amount of Alabama's initial capital contribution to the reserve, and improperly added contributions paid by local governments, publicly-funded educational institutions, and publicly-funded healthcare providers.

### 1. Percentage of Federal Share

Although the DAB ultimately used numbers supplied by Alabama in determining the federal share, Alabama contends that those numbers determined the federal share for 1990, and consequently, do not provide substantial evidence as to the federal share for the transferred funds which began in 1980 and ended in 1986. The Secretary asserts that because Alabama prevailed before the DAB on this issue that it lacks standing to challenge the DAB's decision. This defense is better characterized as judicial estoppel.

■■■ The doctrine of judicial estoppel "is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings."[20] *Talavera v. School Bd. of Palm*

19. In a footnote, Alabama argues that HHS violated its Tenth Amendment right to contract. According to Alabama, a State has the right to make binding obligations and to enter into contracts. *United States v. Bekins,* 304 U.S. 27, 52, 58 S.Ct. 811, 82 L.Ed. 1137 (1938). Even assuming that Alabama may enter into a binding contract with one of its agencies and that a state law may constitute a contract, Alabama has no binding obligations under the law. Therefore, HHS has not violated the Tenth Amendment.

20. Because this case involves federal question jurisdiction and not diversity jurisdiction, the court applies federal law in applying the doctrine of judicial estoppel. *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1261 (11th Cir.1988), *abrogated on other grounds by, Gro-*

*Beach County,* 129 F.3d 1214, 1217 (11th Cir.1997) (quoting *McKinnon v. Blue Cross & Blue Shield,* 935 F.2d 1187, 1192 (11th Cir.1991)); *see also Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 472–73 (6th Cir.1988) ("Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against playing fast and loose with the courts, blowing hot and cold as the occasion demands, or having one's cake and eating it too. Emerson's dictum that a foolish consistency is the hobgoblin of little minds cuts no ice in this context.") (internal quotation marks and citations omitted). "Th[is] doctrine ... prohibits a party from taking inconsistent positions in the same or related litigation." *Iowa Utilities Bd. v. FCC,* 219 F.3d 744, 756 (8th Cir.2000) (quoting *Hossaini v. Western Missouri Med. Ctr.,* 140 F.3d 1140, 1142 (8th Cir. 1998)); *see also Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 2154 n. 8, 147 L.Ed.2d 164 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."). The doctrine of judicial estoppel applies even where the party made the prior inconsistent statements in an administrative forum. *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 72 (2d Cir.1997); *Portela–Gonzalez v. Secretary of the Navy,* 109 F.3d 74, 78 (1st Cir.1997). In sum, "[h]aving induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error." *In Re Carbon Dioxide Indus. Antitrust Litigation,* 229 F.3d 1321, 1326 (11th Cir. 2000) (quoting *Charter Co. v. United*

*States,* 971 F.2d 1576, 1582 (11th Cir. 1992)).

Alabama argues that it did not take inconsistent positions. According to Alabama, the DAB only had the issue of excessive reserves before it because the DCA did not rule on the transfers as a separate disallowance, but only used the transferred funds in computing the total reserve amount that exceeded a reasonable level. Despite Alabama's arguments to the contrary, the Secretary correctly points out that the DAB had both the issue of the transferred funds and the issue of excessive reserves before it.

From the beginning, the Secretary sought a disallowance not just for the alleged excessive reserve, but also for the transferred funds. The disallowance at issue in this case originated from the audit performed by HHS Accountants. The HHS Accountants in the Carmichael Report recommended a disallowance on two bases: (1) the funds Alabama transferred from the SIF plus the interest from those funds and (2) the reserve funds accumulated in excess of federal cost principles. R. 1721.[21] As to the transferred funds, the Report stated that "[t]hese transfers of funds were not allowable uses of Federal funds. If the transfers had not taken place, these amounts would have increased the reserve balance ... of the State Insurance Fund and lowered premiums billed to the Federal government." R 1721.

The DCA reviewed the Carmichael Report and noted that the audit revealed three possible disallowances, the excessive reserve, the transferred funds, and the lost interest from the transferred funds. R. 1766. Although the DCA listed transferred funds as a disallowance, the DCA's

---

gan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**21.** The Carmichael Report stated that:

We reviewed the State Insurance Fund's reserve balance accounting records ... and our review revealed the following:

a. Transfers out (totalling [sic] $43,260,-000) of the fund into the State of Alabama's general and other funds.

b. Reserve balances accumulated in excess of Federal cost principles.

c. Interest of approximately $12,460,793 was lost because of transfers out of the fund.

R. 1721.

decision focused primarily on the excessive reserve argument and barely mentioned the transferred funds. According to the DCA, "[t]he State, in its response to the draft audit report, agreed that monies had been transferred out of the fund.... However, the State disagreed with the assertion that there was an excess reserve balance in the fund.... This finding is discussed below." R. 1766. Alabama did not contest crediting the SIF with the transferred funds in determining the reserve balance because such a credit would occur if the agency characterized the transfers as loans, which Alabama desired. Reply Br. at 8. The DCA, however, did not make any decision as to whether or not to characterize the transfers as loans.

After the DCA issued its decision, Alabama filed a motion for reconsideration. In this motion, Alabama recognized that the DCA failed to characterize the transferred funds as loans. In its application for reconsideration, Alabama contended that the DCA's decision did not reflect the complete picture as to the transferred funds. R. 1788. Alabama insisted that the transferred funds were loans and should be treated as such. R. 1788.

On reconsideration, the Regional Director clarified the transferred funds issue. The Director stated that:

> These [audit] procedures require the auditors to determine whether any retained or unexpended earning (including reserves) are present and, if so, determine: ... (b) if they are excessive in amount, and (c) *whether a refund has been made to the Federal Government for its fair share of any amounts thereof which have been removed (transferred out) or borrowed from the fund.* These determinations have been made and are the basis of our claim against the State of Alabama.

R. 1803 (emphasis added). Therefore, the Regional Director expressly stated that the HHS sought a disallowance for its share of the transferred funds.

Moreover, the Secretary in her brief to the DAB clarified that at a minimum she sought a disallowance for the federal share of the funds Alabama transferred from the reserve. In her brief, she stated that "Alabama converted the Federal share of $43,260,000.00 to its own use. The Federal share of these funds, along with the interest on the Federal share, must be returned to the Federal government. *This is true regardless of whether the SIF fund balance is excessive.*" R. 354 (emphasis added). As a result, the court finds that Alabama had notice that the Secretary sought a disallowance on the basis of the transferred funds and finds that the DAB had the issue of the transferred funds before it.

■ Even with the knowledge that the Secretary sought a disallowance based on the transfers alone, Alabama asserted without any reservations that the DAB should adopt Alabama's federal share numbers. For example, in Alabama's first brief to the DAB, Alabama stated that it hired DMG "to discover the *actual federal share* of the SIF's reserves." R. 257 (emphasis added). According to Alabama, DMG conducted an extensive and meticulous review to determine the federal share of the state and local premium payments. R. 257. In concluding, Alabama argued that "[t]he Board should adopt DMG's findings that the federal share of premium payments into the SIF is 7.75 percent of premium payments by State agencies and .74 percent of premium payments by local agencies." R. 261.

Alabama now argues for the first time that the DAB should not have accepted the DMG findings. Alabama asserts that the DMG survey does not provide a substantial basis to determine the federal share of premium payments between 1980 and 1986 because the DMG based its participation rates on 1990 data and does not report that the 1990 data is representative of the federal share in earlier years. Al. Reply Br. at 12. The Secretary, however, made the same argument to the DAB. The Sec-

retary argued to the DAB that the DMG study lacked probative value because DMG's "data derived from the year 1990 even though the selection of that year was not based on any statistical method that would allow the experiences of 1990 to be considered representative of any other year." R. 441. According to the Secretary's argument before the DAB, "the DMG study fails to establish a nexus between the 1990 experiences and those of the prior years at issue in this case." R. 441–42.

In response, Alabama disagreed with the Secretary that the data lacked probative value because it surveyed only 1990. R. 616. Alabama also reiterated its request that "[t]he Board should adopt DMG's conclusion that the federal share is 7.75 percent of premium payments by state agencies and 0.74 percent of premium payments by local agencies." R. 617. The DAB agreed with Alabama by rejecting the government's argument that the DMG study lacked probative value because it relied only on 1990 data and adopting Alabama's federal share numbers. *Alabama,* DAB No. 1635 at 25.

Now that Alabama finds that its federal share numbers are not beneficial, it has changed its stance. This is precisely the type of calculated assertion of inconsistent positions which the doctrine of judicial estoppel prohibits. *Chrysler Credit Corp.,* 842 F.2d at 1261 (holding that the doctrine of judicial estoppel prohibited a party form claiming that he did not substantially participate in a car dealership where the same party claimed in a prior suit that he did substantially participate in a car dealership). For instance, in *Portela–Gonzalez v. Secretary of the Navy,* 109 F.3d 74 (1st Cir.1997), the First Circuit held that the doctrine of judicial estoppel prohibited a party from taking "one position in an underlying administrative proceeding and then disclaim[ing] it in a subsequent suit arising out of the agency proceedings." *Id.* at 78. The plaintiff, in *Portela–Gonzalez,* argued to the court that she did not

exercise the fourth level of administrative review pursuant to a new Navy regulation because the new Navy regulation did not apply. *Id.* at 77. The plaintiff, however, consistently argued for the application of the new Navy regulation throughout the latter stages of the administrative process, and the ultimate decisionmaker accepted her argument and reviewed the administrative appeal pursuant to the new Navy regulation. *Id.* at 78. As a result, the court held that the doctrine of judicial estoppel precluded the plaintiff from asserting this inconsistent argument. *Id.* As the court explained, "she cannot now be heard to complain that the agency surrendered to her exhortation." *Id.*

Similarly, this court finds that the doctrine of judicial estoppel precludes Alabama from arguing that the DAB erroneously accepted Alabama's federal share numbers. As in *Portela–Gonzalez,* Alabama cannot now be heard to complain that the DAB accepted its position. *See also In re Carbon Dioxide,* 229 F.3d at 1326 ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.").

### 2. Capital Contributions

Alabama also argues that the DAB's disallowance decision is arbitrary or capricious because the DAB failed to deduct Alabama's capital contributions from the amount of funds transferred from the SIF reserve. Al.Br. at 99. In 1923, Alabama created the SIF reserve with only state funds and continued to operate the SIF with only state funds until 1960. The SIF reserve had a balance of $4.87 million in 1960, which with interest amounts to approximately $33.6 million by 1990. According to Alabama, it may select the last-in, first-out ("LIFO") accounting method, under which the state-only funds first deposited into the SIF reserve would be the last ones removed.

The DAB found that Alabama produced no evidence that it used the LIFO account-

ing method and Alabama has not challenged this finding. Alabama only makes the bald assertion that it could have used the LIFO method. Therefore, the court finds that the DAB's decision is not arbitrary or capricious in that Alabama has not produced any evidence that it used the LIFO accounting method.

3. Local Governments, Educational Institutions, and Health Care Providers

Alabama also argues that the DAB erred in including premium payments made by local governments, publicly-funded educational institutions, and publicly-owned health care providers. As to the local entities, Alabama asserts that the court may not collapse local entities into the single unit theory because local entities are separate from the State and, thus cannot be included in the transferred amount. The court rejects this argument because the Circular applies to local entities and the Circular imposes an independent obligation on the SIF to charge costs consistent with the Circular.

■ Alabama, however, correctly notes that the Circular explicitly exempts publicly-funded educational institutions and publicly-owned health care providers from the Circular's cost principles.[22] OMB A-87(5)(b). As to these institutions, the DAB held that general principles of federal appropriations law and the cost principles contained in regulations dealing with educational and health care providers support such a disallowance. A general principle of federal appropriations law provides that federal funds may be used only for authorized purposes. 31 U.S.C. § 1301(a) (appropriations may be applied only to the "objects for which the appropriations were made"); *Oklahoma Office of State Finance*, DAB No. 1668 at 7 n. 4; *New York State Dept. of Social Servs.*, DAB No. 1358 (H.H.S.1992). In addition, OMB Circular

A-21 which governs costs for publicly-funded educational institutions contains cost principles analogous to the Circular. In particular, OMB Circular A-21 provides that costs must be reasonable and prohibits shifting funds from an authorized program to another program. OMB Circular A-21 at (C)(2) & (C)(4)(c). As to health care providers, the DAB noted that § 1903(a)(7) of the Social Security Act, 42 U.S.C. § 1396b(a)(7), limits reimbursement for administrative costs under the Medicaid program to amounts "found necessary by the Secretary for the proper and efficient administration of the State plan." Based on these principles, the DAB reasonably held that the SIF violated general principles of federal appropriation law and other laws by transferring funds from the SIF to non-authorized uses. Thus, the DAB did not act arbitrarily or capriciously in including premium payments made by publicly-funded educational institutions and publicly-owned health care providers in the total disallowance.

Alabama also asserts a number of additional defenses to the DAB's decisions. In particular, Alabama argues that the Circular was improperly promulgated, that the disallowance is untimely under the statute of limitations in 28 U.S.C. § 2415, and that the McCarran–Ferguson Act prohibits the HHS from invalidating, impairing, or superseding a law enacted by Alabama for the purpose of regulating the business of insurance. The court will address each issue in turn.

**D. Promulgation of the Circular**

Alabama asserts that HHS failed to promulgate the Circular in accordance with the APA's procedural requirements. In particular, Alabama alleges that HHS failed to follow the APA's notice and comment procedures.

■ In response, HHS argues that the statute of limitations bars Alabama's

22. The 1995 amended version of the Circular provides that "this Circular does apply to all central services and department/agency costs that are allocated or billed to those education-

al institutions, hospitals, and other providers of medical care or services by other State and local government departments/agencies." Revised OMB A–87, Att. A, (A)(3)(a).

claim because Alabama failed to bring a procedural challenge to the Circular within six years after it was promulgated. Because the APA lacks a specific statutory limitations period, a civil action against the United States under the APA is subject to the six year limitations period found in 28 U.S.C. § 2401(a).[23] *E.g., Polanco v. United States Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir.1998) (finding § 2401(a)'s the six-year statute of limitations applicable to APA cases); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir.1997) (same); *Dunn–McCampbell Royalty Interest, Inc. v. National Park Serv.*, 112 F.3d 1283, 1286 (5th Cir.1997) (same); *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1494–95 (10th Cir. 1997) (same). A cause of action challenging procedural errors in the promulgation of a regulation accrues on the issuance of the regulation.[24] *Cedars–Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999); *Pennsylvania Dep't of Public Welfare v. United States Dep't of Health & Human Servs.*, 101 F.3d 939, 944–45 (3d Cir.1996); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 713 (9th Cir. 1991). In contrast, a cause of action challenging a regulation based on the grounds that an agency exceeded its constitutional or statutory authority accrues when the agency applies the regulation to the specific challenger. *Wind River*, 946 F.2d at 715; *see also Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152 (D.C.Cir.1990) ("[A]lthough a statutory review period permanently limits the time within which a petitioner may claim that an agency action was procedurally defective, a claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition"). Because Alabama does not contest the Circular on the grounds that HHS exceeded its statutory or constitutional authority, the cause of action accrued on the issuance of the Circular.

HHS first published the Circular in the Federal Register in 1973, 38 Fed.Reg. 12,-315, and incorporated the Circular by reference in 1980, 45 Fed.Reg. 34,273 (May 22, 1980). Alabama filed its complaint on March 17, 1999. Therefore, Alabama's procedural claim is time-barred.[25]

**E. Statute of Limitations for the Disallowance**

Alabama argues that the statutes of limitations found in 28 U.S.C. § 2415(a) and

**23.** Section 2401(a) provides, in pertinent part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

**24.** The court does note that the former Fifth Circuit has reviewed a procedural challenge to a regulation even though the thirty day time limit to request review had passed. *Alabama Assoc. of Ins. Agents v. Board of Governors of the Fed. Reserve Sys.*, 533 F.2d 224, 235–36 (5th Cir.1976), *vacated in part on other grounds*, 558 F.2d 729 (5th Cir.1977). The decision in *Alabama Association* is distinguishable from the case at bar. First, the Fifth Circuit did not address the effect of 28 U.S.C. § 2401(a). Instead, the Fifth Circuit only examined the effect of the thirty day limit imposed by 12 U.S.C. § 1848. *Id.* at 235. Second, in *Alabama Association*, the Fifth Circuit noted that some of the parties had challenged the regulations, but another federal court of appeals held that the challenge was premature and not ripe because the issues could be litigated in connection with specific applications under the regulation. *Id.* at 232, 236 n. 8. Third, the regulation at issue by its nature could only be conclusively resolved in the context of specific applications. *Id.* at 236. The case at hand lacks these three elements, thus the decision in *Alabama Association* does not bind the court.

**25.** Even assuming the statute of limitations does not preclude Alabama from raising its procedural arguments concerning the promulgation of the Circular, this court finds that HHS satisfied the APA requirements in promulgating the Circular. *New York v. Shalala*, 959 F.Supp. 614, 618–19 (S.D.N.Y.1997) (holding that the HHS properly adopted the Circular as a regulation), *aff'd*, 143 F.3d 119 (2d Cir.1998).

in various agency regulations bar the Secretary's disallowance claim.[26] Alabama did not present this argument to the DAB. Consequently, the Secretary contends that this court may not consider this argument. *Chipman v. Shalala*, 90 F.3d 421, 423 (10th Cir.1996) (holding, in a dispute over Medicare insurance coverage, that a plaintiff waived arguments he did not present before the administrative law judge); *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir.1994) (holding, in a Medicare reimbursement dispute, that it is inappropriate to consider arguments not raised during the administrative process); *see also United Transp. Union v. Surface Transp. Bd.*, 114 F.3d 1242, 1244 (D.C.Cir. 1997) ("[C]laims not presented to the agency may not be made for the first time to a reviewing court.").

In response, Alabama asserts that it did not raise the statute of limitations argument because the DAB reviewed the DCA's decision as to whether or not the SIF reserve levels were excessive and did not have before it the issue of the transfers. As explained in Part C.1., the record, however, shows that the DAB did have the issue of the transfers before it. Thus, this court will not address Alabama's statute of limitations argument for the first time on appeal.

■ Even assuming that Alabama did not waive its statute of limitations argument, Alabama's argument as to 28 U.S.C. § 2415(a) fails. Absent a clear expression by Congress to the contrary, a statute of limitations does not apply to claims brought by the federal government in its sovereign capacity. *United States v. Banks*, 115 F.3d 916, 919 (11th Cir.1997). This rule is based on two grounds: (1) "the wellestablished rule that 'an action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it;'" and (2)

the canon of statutory construction that "any statute of limitations sought to be applied against the United States 'must receive a strict construction in favor of the Government.'" *Id.* (citations omitted); *United States v. Alvarado*, 5 F.3d 1425, 1428 (11th Cir.1993).

■ Alabama contends that Congress clearly imposed a statute of limitations on the Secretary's disallowance pursuant to 28 U.S.C. § 2415(a). Section 2415(a) provides, in pertinent part, that "every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues." By its express terms, this statute applies only to actions for money damages founded upon a contract. *Alvarado*, 5 F.3d at 1428. According to HHS, section 2415(a) does not apply because Alabama's action challenging HHS's disallowance is not an "action for money damages."

The Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), held, albeit in a different context, that a disallowance is not an action for money damages. *Id.* at 893, 108 S.Ct. 2722. In *Bowen*, Massachusetts sought judicial review of a DAB ruling upholding the Secretary's disallowance of certain Medicaid costs. *Id.* at 886–87, 108 S.Ct. 2722. The Court faced the question of whether 5 U.S.C. § 702 permitted a district court to review an agency's disallowance decision. *Id.* at 891, 108 S.Ct. 2722. To answer this question, the Court had to determine whether or not a disallowance constitutes "money damages." *Id.* The Court reasoned that the term "money damages" "normally refers to a sum of money used as compensatory relief," and "given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies

---

**26.** Alabama mentions that the Secretary may have missed various limitations periods applicable to grantees, but only cites a Department

of Education statute of limitations, 20 U.S.C. § 1234a(k).

are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he is entitled." *Id.* at 895, 108 S.Ct. 2722 (quoting *Maryland Dep't of Human Res. v. Department of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C.Cir.1985)). When a state challenges a disallowance decision, the state seeks funds to which a statute allegedly entitled it, rather than money in compensation. *Id.* (quoting *Maryland Dep't of Human Res.*, 763 F.2d at 1446). Even though the nature of the relief is money rather than in-kind benefits that pass from the federal government to the states, this "cannot transform the nature of the relief sought—specific relief, not relief in the form of damages." *Id.* (quoting *Maryland Dep't of Human Res.*, 763 F.2d at 1446). Therefore, the Court held that "[n]either a disallowance decision, nor the reversal of a disallowance decision, is properly characterized as an award of 'damages.'" *Id.* at 893, 108 S.Ct. 2722.

Following the rationale in *Bowen*, the court finds that a disallowance decision does not fall within the definition of "money damages" in 28 U.S.C. § 2415(a). Thus, section 2415(a) does not bar the Secretary's disallowance claim. *See S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 5 (Fed.Cir.1985) (holding that 28 U.S.C. § 2415 is inapplicable to an appeal by a contractor from an agency's decision that the contractor owes the Government certain disallowed costs).

**F. McCarran–Ferguson Act**

Alabama argues that the McCarran–Ferguson Act prohibits the Secretary's application of the Circular to the activities of the SIF. In particular, Alabama argues that the Circular impairs Alabama's ability

to lend funds from the SIF reserve to Alabama's general fund.[27] Ala.Code § 41–15–10.1 (1980), *repealed by* 1984 Ala. Acts 313.

Before the DAB, Alabama did not argue that by prohibiting the transfers the Circular violated the McCarran–Ferguson Act. Instead, Alabama argued that the Circular impermissibly regulated the business of insurance by restricting the SIF's ability to establish a reserve, to determine the amount of the reserve, and to decide whether to purchase reinsurance or not.[28] R. 648. Because the DAB held that the SIF did not have an excessive reserve, the DAB rejected this argument as moot. *Alabama*, DAB No. 1656 at 25. Now, Alabama raises for the first time that the Circular violated the McCarran–Ferguson Act by limiting the SIF's ability to transfer funds from its reserve. "[C]laims not presented to the agency may not be made for the first time to a reviewing court." *United Transp. Union*, 114 F.3d at 1244. Thus, Alabama waived this argument.

 Even assuming that Alabama did not waive this argument, Alabama's McCarran–Ferguson Act argument lacks merit. Congress enacted the McCarran–Ferguson Act to ensure that state regulatory schemes for insurance would not be impaired and overridden except by specific and explicit Congressional enactments. *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). The Act states, in pertinent part, that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance."

---

**27.** Alabama in its brief asserts that the Circular impairs the SIF's ability to make loans to Alabama. Because the court finds in Part C.1. that the DAB reasonably construed the transfers not as loans, but as outright transfers of funds, the court will likewise review the insurance activity as SIF's ability to transfer funds to Alabama.

**28.** On appeal, Alabama does contend that the DAB's decision to apply a reasonableness standard to the reserve levels violates the McCarran–Ferguson Act. The court, however, need not decide this issue because the DAB found that the SIF had a reasonable reserve level.

15 U.S.C. § 1012(b). In order to determine whether the McCarran–Ferguson "reverse preemption" applies, the Eleventh Circuit has set forth a four part test: (1) whether the federal law specifically relates to the business of insurance; (2) whether the challenged acts constitute the business of insurance; (3) whether the state law at issue was enacted for the purpose of regulating the business of insurance; and (4) whether the application of the federal law would impair, invalidate, or supersede the state law at issue. *Cochran v. Paco, Inc.,* 606 F.2d 460, 464 (5th Cir.1979).

■ Prior to delving into the four part test, the court will clarify the scope of inquiry under the McCarran–Ferguson Act. Alabama throughout its brief focuses on the laws that regulate the SIF in general. Although the SIF may be in the business of insuring,[29] the McCarran–Ferguson Act focuses on specific activities and not on entities as a whole. *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 781, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ("The cases confirm that 'the business of insurance' should be read to single out one activity from others, not to distinguish one entity from another."); *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc.,* 50 F.3d 1486, 1489 (9th Cir.1995) ("Thus, the proper inquiry is whether a particular 'practice constitutes the business of insurance,' not whether the defendant and the plaintiff transact the business of insurance in general."); *see also Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (framing the question as "whether a particular practice is part of the 'business of insurance'"); *SEC v. National Securities, Inc.,* 393 U.S. 453, 459, 89 S.Ct. 564,

21 L.Ed.2d 668 (1969) (holding that the McCarran–Ferguson Act's "language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the business of insurance' "). The Supreme Court has stated that "[i]nsurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the [McCarran–Ferguson] statute apply." *National Securities, Inc.,* 393 U.S. at 459–60, 89 S.Ct. 564. Therefore, in turning to the second and third factors of the McCarran–Ferguson Act, the court reviews whether the activity complained of by HHS—the transferring of funds out of the SIF reserve—is part of the business of insurance and whether Alabama passed the law for the purpose of regulating insurance.[30]

#### 1. Business of Insurance

■ In *Pireno,* the Supreme Court established three factors to consider when determining whether an activity is considered part of the business of insurance: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry."[31] 458 U.S. at 129, 102 S.Ct. 3002. "Each of these criteria works in tandem with the others, and '[n]one of these criteria is necessarily determinative in itself.' " *Blackfeet Nat'l Bank v. Nelson,* 171 F.3d 1237, 1246–47 (11th Cir.1999) (quoting *Pireno,* 458 U.S. at 129, 102 S.Ct. 3002). After reviewing the record and the parties' briefs, the

**29.** HHS also argues that generally a self-insurance entity may not satisfy the business of insurance requirement. This court need not address this issue because Alabama's argument fails on other grounds.

**30.** Because Alabama's argument fails the second and third prong, the court need not address the first and fourth prongs.

**31.** Although *Pireno* addressed the second clause of § 1012(b), the Eleventh Circuit has held that the *Pireno* test applies to the first clause of § 1012(b). *Blackfeet Nat'l Bank v. Nelson,* 171 F.3d 1237, 1246 n. 13 (11th Cir. 1999).

court finds that the transfer of funds from the SIF reserve to Alabama does not meet the *Pireno* factors.

■ First, the transfer of funds from the SIF reserve to Alabama clearly plays no part in transferring or spreading a policyholder's risk. An outright payment to Alabama from the SIF reserve has nothing to do with spreading risk. Even assuming the transfer was a loan, the loan did not transfer any risk, and instead only required Alabama to pay back the money it received as a loan. Second, the practice of transferring funds between Alabama and the SIF reserve is not an integral part of a policy relationship between the insureds and the SIF because the challenged transfer or loan agreement is a separate and distinct agreement from SIF's insurance contracts with its policyholders. *Pireno*, 458 U.S. at 131, 102 S.Ct. 3002 (holding that a contract distinct from the insurer's contracts with its policyholders is not an integral part of a policy relationship between the insureds and the SIF). Third, this particular practice is not limited to entities within the insurance industry. Consequently, the court concludes that the transferring of funds from the SIF is not part of the "business of insurance." *Cf. Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 215, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (holding that agreements between an insurance company and pharmacies involving the cost of prescription drugs did not constitute the "business of insurance").

### 2. Purpose of Regulating

Additionally, Alabama did not enact the law that ordered the SIF to transfer reserve funds to Alabama for the purpose of regulating the business of insurance. Instead, Alabama enacted the law to give Alabama access to funds needed to avoid a budgetary crisis in other areas of government. Pl.Brf. at 11. By focusing its attention on protecting the fiscal security of the State, instead of regulating insurance, Alabama did not enact the law for the

purpose of regulating the business of insurance. *National Securities*, 393 U.S. at 460, 89 S.Ct. 564 ("The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies. Such regulation is not within the scope of the McCarran–Ferguson Act."). Moreover, the fact that the transfer law only applied to the SIF does not alter the law's purpose. In *National Securities*, the Court held that although the state law at issue only applied to insurance companies, the state did not enact the law for the purpose of regulating the business of insurance. *Id.* at 460, 89 S.Ct. 564. Therefore, the court finds that Alabama did not enact the transfer law for the purpose of regulating the business of insurance. Accordingly, the court finds that the McCarran–Ferguson Act does not apply.

### V. CONCLUSION

The Legislature of Alabama transferred millions of dollars from the State Insurance Fund to the state's general fund to be used for purposes totally unrelated to the insuring of property owned by Alabama and local governments. The state was given permissive authority to pay the money, plus interest, back into the SIF "whenever the state finance director, with approval of the governor, determines that there are sufficient funds in the state general fund." No money has been paid back in over 20 years since the time of the first transfer. Part of that money was from federal grants, used to insure property. An administrative determination has been made that the portion of the transferred funds made up of federal money was improperly transferred from its authorized use to unrelated and unauthorized uses. Alabama has advanced numerous arguments for why the Departmental Appeals Board's determination, that Alabama's transfer of federal funds out of the State Insurance Fund was unauthorized by law, was arbi-

trary and capricious. The court finds all of those arguments to be without merit.

For the reasons stated above, the court finds that the DAB's decision to affirm HHS's disallowance of the federal share of the transferred funds is supported by substantial evidence and is not arbitrary or capricious. Accordingly, the final determination of the DAB is due to be AFFIRMED, and a separate Order and Judgment will be entered in accordance with this Memorandum Opinion.